JOSEPH H. MARTIN, Appellant, v. STAR PUBLISHING COMPANY, a corporation of the State of Delaware, Appellee.

(*October* 25, 1956.)

SOUTHERLAND, C. J., and WOLCOTT and BRAMHALL, J. J., sitting.

*Russell J. Willard* and *Clarence W. Taylor* (of Hastings, Lynch and Taylor) for appellant.

*William E. Taylor, Jr.*, for appellee.

Supreme Court of the State of Delaware, No. 12, 1956.

SOUTHERLAND, C. J.:

The principal question in this case is whether the doctrine of impossibility or "frustration" excused the defendant from its contractual obligations to the plaintiff.

The facts are these:

Prior to October 3, 1946, Joseph H. Martin, plaintiff below, was the president and owner of all the capital stock of Star Publishing Company, the principal business of which was the printing and publishing in the City of Wilmington of The Sunday Star, a weekly newspaper.

On October 3, 1946, Martin entered into an agreement with J. Edwin Carter for the sale of the business. This agreement was the genesis of a later contract sued on in this case.

The October 3, 1946 agreement has given rise to a series of law suits, and the end is not yet. Various aspects of the matter have been three times before this Court. For its prior opinions see the following cases: *Star Publishing Co. v. Martin,* 47 *Del.* 585, 95 *A.* 2d 465; *Star Publishing Co. v. Martin,* 48 *Del.* 106, 95 *A.* 2d 835; *Bayard v. Martin, Del.,* 101 *A.* 2d 329.

By the agreement of October 3, 1946, Martin sold to Carter all his shares of stock in the Star for the sum of $105,500, payable in installments and evidenced by a series of promissory notes the last of which will mature February 1, 1957. These notes include a power of attorney to confess judgment.

Paragraph 9 of the contract of October 3 provided in part:

"Carter will cause The Star Publishing Company, upon final settlement, to retain Martin as an advisor in the conduct of its printing and publishing business, such employment to be for the lifetime of said Joseph H. Martin, Sr. Martin hereby agrees to act in such capacity and hold himself available at reasonable times to perform his said duties. The consideration for such contracted employment shall be $40,000.00 payable at the rate of $100.00 a week for the first four hundred weeks from and

after October 7, 1946, until the full amount of $40,000.00 shall have been paid to Martin, his heirs, administrators, executors or nominees; and further that if Martin shall be living and able and willing to perform his duties hereunder Martin shall continue to receive the sum of $100.00 a week for a period of 120 weeks."

The four-hundred-week period we shall refer to as "the first period"; the one-hundred and twenty-week period as "the renewal period".

Although these provisions were cast in the form of an employment agreement, it is quite clear that, at least so far as concerns the first period, the contract was little more than a means of paying Martin for the sale. Even if he died during this period his estate was to continue to receive the payments. Moreover, it is also clear that as concerns the renewal period the payment of the additional $12,000 was conditioned only upon his being alive and able to perform his duties.

On November 15, 1946, in compliance with the covenant in paragraph 9 above quoted, Star entered into an agreement with Martin reciting the facts about the sale and providing in substance as follows:

1. The Star retained and employed Martin as an adviser "in the conduct of its printing and publishing business."

2. Martin agreed to perform the duties of advisor at reasonable times upon one week's notice from Star on every occasion when his services were demanded.

3. The Star agreed to pay to Martin or his estate $40,000 in weekly installments of $100 each for four hundred weeks, beginning from October 7, 1956. It was further provided:

"Said installments shall be due and payable irrespective of the extent or value of the services performed by Martin and irrespective of whether or not Martin is able to perform the above stated duties during any part or any of the period covered by the installments."

Paragraph 5 of the contract provides:

"Upon the expiration of the aforementioned period of four hundred weeks beginning and from October 7, 1946, if Martin shall be living and able and willing to continue to perform the duties stated above, Martin shall have an irrevocable option to continue his employment and retainer as described in paragraphs 2 and 3 hereof for a period of one hundred and twenty weeks from the date on which Martin shall exercise such option or for such lesser period as Martin may be able to perform such duties, during which period The Star Publishing Company shall pay to Martin the sum of One Hundred Dollars ($100.) per week, payable weekly; irrespective of the extent or value of the services performed by Martin. Said option herein granted to Martin shall be exercised by him within thirty days from the date of expiration of the aforementioned four hundred week period by the mailing of written notice of the exercise of such option to The Star Publishing Company at 305-309 Shipley Street, Wilmington, Delaware."

This is the agreement sued upon.

The contract of November 15 does little more than to spell out the provisions of paragraph 9 of the contract of October 3, 1946. The $40,000 is to be paid whether Martin lives or dies, or whether he is able to perform any services whatever. The payments during the renewal period are expressly conditioned only (1) upon the exercise by Martin of the option, and (2) upon his being alive and able to perform his duties, if any, during the period. The advisory service in the renewal period, as in the first period, is to be rendered only upon demand at every time when Star desires such service; and the payments in the renewal period, as in the first period, are due "irrespective of the extent or value of the services performed by Martin". Hence, although the provisions relating to the renewal period have some aspects of an employment agreement, they also, like the provisions for the first period, provide a means for giving Martin additional compensation for the sale of his business.

The Star discontinued its business on April 18, 1954 and thereafter declined to make any payments on the contract. Martin brought an action to recover the remaining payments due under the first period. This is not the suit before us. The trial court appears to have held that as to the first period the voluntary cessation of Star's business did not excuse Star from its contractual obligation to make the payments. This decision is not here questioned.

On June 1, 1954, some days before the end of the first period, Martin gave written notice of his exercise of the option granted to him by paragraph 5 of the November 15 agreement. Star refused payment and the present suit was brought. Cross motions for summary judgment were filed. The court granted Star's motion. The trial judge held that the continued existence of Star's business was an implied or constructive condition of Star's obligation under paragraph 5; that the non-existence of the business made performance thereunder by Star excusably impossible; and that Star was therefore discharged from liability from the payments during the renewal period. Martin appeals.

*Was the continued existence of the Star's business an implied condition of its liability to Martin for the payments during the renewal period?*

In answering this question in the affirmative the trial judge first reviewed the principles of law relating to the defense of impossibility of performance. He then held that in the circumstances of this case it was reasonable to presume that when the contract was made both parties assumed that the defendant's business would be in existence when the time for performance in the renewal period arrived. He accordingly held that the existence of that business at such time was an implied condition of the contract.

With the statement of the general principles of the law in the court's opinion we are in accord. The doctrine of impossibility or "frustration" has been evolved "from the court's sense of justice". 6 *Williston on Contracts*, § 1937. The classes of cases

to which the rule is applicable are stated by Williston as follows:

"(1) Impossibility due to domestic law;

"(2) Impossibility due to the death or illness of one who by the terms of the contract was to do an act requiring his personal performance;

"(3) Impossibility due to fortuitous destruction or change in character of something to which the contract related, or which by the terms of the contract was made a necessary means of performance.

"The fourth class of cases, to which allusion was made above as standing on more debatable ground, comprises cases where impossibility is due to the failure of some means of performance, contemplated but not contracted for.

"The fifth class does not strictly fall within the boundaries of impossibility. Performance remains entirely possible, but the whole value of the performance to one of the parties at least, and the basic reason recognized as such by *both* parties, for entering into the contract has been destroyed by a supervening and unforeseen event."

In applying the law the courts have attempted to square the result with the principles of contract law by finding "an implied condition" in the contract. It is increasingly recognized that in this field of the law the so-called implied condition is a fiction—an effort "at rationalizing a judicial process". 6 *Corbin on Contracts*, § 1331. See the English authorities cited in note 61 to the text.

It is unnecessary for us to review the development of this rule or attempt to delimit its scope, since we are clearly of the opinion that the rule has no application to the case before us. We find no decision, either in the opinion of the court below or in the Star's brief, holding the rule to be applicable to a case in which the unforeseen event or the destruction of

the subject matter of the contract is the voluntary act of the promisor in closing down his business. The event that creates the impossibility must be a fortuitous one. See the quotation from Williston, above, and see § 1959 in which the author says: "It is only fortuitous impossibility that excuses from liability * * *".

In 6 *Corbin on Contracts,* § 1329, it is said:

"In all the cases holding that the promisor was discharged from duty by impossibility of performance or frustration of purpose, it has been assumed that the promisor was not himself the responsible cause of the impossibility or frustration."

A corporation is not excused from performance of an agreement to pay money because it voluntarily dissolves or discontinues its business. There may be cases in which enforced dissolution of a corporation will relieve it of obligations of a personal character under contract. *Tenner v. Retlaw Dev. Corp.,* 163 *Misc.* 248, 295 *N. Y. S.* 31.

"If, however, the corporation involuntarily dissolves itself, or winds up its business, even such a contract [where the obligation is personal in character], though made impossible of performance, is made so by the act of the corporation, and it or its assets are liable for its failure to fulfill its obligations". 6 *Williston,* § 1960.

A *fortiori,* where the obligation is merely to pay money, as here, the corporation remains liable.

Star voluntarily chose to discontinue its business, presumably for financial reasons. Impossibility originating in financial incapacity is no excuse. 6 *Williston on Contracts,* § 1960.

There is ample authority that a contract to pay for services to be rendered over a specified period is not discharged by the voluntary cessation of business of the employer. *Tiffin Glass Co. v. Stoehr,* 54 *Ohio St.* 157, 43 *N. E.* 279 (voluntary dissolution) ; *Merchants Life Ins. Co. v. Griswold, Tex. Civ. App.,*

212 *S. W.* 807 (voluntary amendment of charter precluding continuation of certain type of business) ; *St. Louis & Denver Land & Mining Co. v. Tierney*, 5 *Colo.* 582 (voluntary discontinuance of certain type of business) ; *Madden v. Jacobs*, 52 *La. Ann.* 2107, 28 *S.* 225 (voluntary cessation of business) ; *MacGregor v. Union Life Ins. Co.*, 8 *Cir.*, 121 *F.* 493 (discontinuance of business by insurance company is no defense to suit on five-year contract with agent).

In *Baumer v. Franklin County Distilling Co.*, 6 *Cir.*, 135 *F.* 2d 384, 388, it was held that a contract with a salesman to push a certain brand of whiskey was not discharged because the distilling company elected to withdraw the brand from the market. The Court said:

"No specific provision that the appellee should remain in the distilling business was necessary to entitle appellant to rely upon the implied obligation inherent in appellee's promise to supply the K. Taylor brand during the three-year life of the contract. An agency contract, terminable at will, is not to be deduced from the terms of the contract itself, or by necessary implication from its setting. On the contrary, the contract expressly provided for performance by both parties of their several obligations throughout a course of three years' time. It has long been established law that one, who, by his own action has rendered himself incapable of performing a contract, may not successfully plead impossibility of performance in defense of his breach."

See also *Brearton v. De Witt*, 252 *N. Y.* 495, 170 *N. E.* 119; and compare *Gamble v. Penn Valley Crude Oil Corp., Del. Ch.*, 104 *A.* 2d 257 (voluntary dissolution of corporation no defense to action for damages on stock option contract).

We have examined all the cases cited in the opinion of the trial court and in the brief for Star. None of them is in point. *Duff v. Trenton Beverage Co.*, 4 *N. J.* 595, 73 *A.* 2d 578, is a case of impossibility because of illegality. *Gouled v. Holwitz*, 95 *N. J. L.* 277, 113 *A.* 323, is a case of frustration by destruction by

a third party of the subject matter of the contract. *Greek Catholic Congregation v. Plummer*, 338 *Pa.* 373, 12 *A.* 2d 435, 127 *A. L. R.* 1008 is a case of discharge "by reason of considerations beyond the control of the parties". *Tamplin Steamship Co. Ltd. v. Anglo-Mexican Pet. Products Co. Ltd.*, 2 *AC* 397 [1916], involves a seizure by the Admiralty of a ship under charter party. *Housing Authority v. East Tennessee, etc.*, 183 *Va.* 64, 31 *S. E.* 2d 273, involves the failure of a nearby supply of natural gas caused by no fault of either party. *Lagenberg v. Guy*, 77 *Cal. App.* 664, 247 *P.* 621, turns on the language of the contract itself.

We are accordingly constrained to disagree with the court's conclusion that the doctrine of impossibility or frustration availed to defeat Martin's action on the contract.

However, the opinion below may be read as holding that even if the defense of impossibility is not applicable, yet an implied term or condition may be read into the contract, *i. e.*, that the languge of the agreement, in the light of the situation of the parties, discloses an intention that Star was not to be liable to Martin during the renewal period if it had no business to offer him and therefore no occasion for his services.

Of course, there are cases in which a necessary term of a contract, omitted through inadvertence, may be supplied by the court from principles of law. If no time for performance is fixed, the court will imply a reasonable time, or if a contract fails to provide specifically for the payment of goods sold, a promise to pay will be implied, and the like. See 17 *C.J.S., Contracts*, § 328, and cases cited. These are cases in which a court may confidently say that it has merely effectuated the intention of the parties. But no such case is made here.

There is no language in the contract justifying the inference that anything was omitted. Moreover, the provisions for payment over a specified period, conditioned only on Martin's life and capacity, are inconsistent with the term sought to be implied. As the court said of the contract before it in the *Baumer* case,

*supra,* a contract terminable at will is not to be deduced from the terms of this contract or its setting.

One usual test for implying a term omitted from a contract is a determination by the court that the parties would certainly have agreed to it had it been proposed. See *Cousins Inv. Co. v. Hastings Clothing Co.,* 45 *Cal. App.* 2d 141, 113 *P.* 2d 878, 882. How can we say that Martin would have agreed to such a condition if Star had proposed it? Against the background of this contract it seems most unlikely, because the provisions for the payments were, as we have said, a means by which Star itself paid Martin additional consideration for the sale.

It is said there is no reason for the distinction between the provisions respecting the first period and the provisions respecting the renewal period if the continued existence of Star's business was not to be implied as a condition of Star's liability. This does not follow. Martin's age was a sufficient reason for the distinction. It was not strange that the parties should stipulate for the payment of $40,000 over a period of four hundred weeks as an absolute obligation and an additional $12,000 only if Martin continued to live and was able to render services. At all events that is the bargain they made. Indeed, the contract of October 3 contained a clause that the payments were to be made during Martin's lifetime, although this clause is inconsistent with subsequent clauses. The contract sued upon resolves this ambiguity in favor of Star, but in our opinion does nothing more than to make the obligation during the renewal period dependent upon the conditions expressly set forth, and upon nothing more.

The court below held, correctly we think, that there was no implied term that the Star continue its business for Martin's benefit; but we think that there is likewise no implied term that Star's obligation to Martin should cease merely because it chose to discontinue its business.

In any view of the case we are of the opinion that the implied condition cannot be read into the contract.

Our holding on this point requires us to consider a second contention on behalf of Star made below and renewed here. Because of his holding on the first contention, it was unnecessary for the trial judge to consider it.

It is contended that Martin's exercise of his option under paragraph 5 of the November 15th contract was legally ineffective because given prior to June 10, 1954, the date of the expiration of the first period. Paragraph 5 of the contract quoted above provides that Martin shall exercise his option "within thirty days from the date of the expiration of the Star's four hundred week period * * *". This means, says Star, that the notice must be given *after* the date of such expiration and a notice given before such expiration is ineffectual.

The notice given by Martin was in the following language:

"I hereby exercise my irrevocable option as provided in that paragraph of our agreement to continue my employment and retainer. I am ready and able to comply with its terms and ask that I be paid therefore $100 a week for 120 weeks beginning with the week of June 20, 1954 and payable on the subsequent Wednesday of each week until the agreement ends."

We think that the natural interpretation of the notice is that Martin elected to exercise the option as of the date he specified, i. e., "beginning with the week of June 20, 1954". The legal effect was the same, it seems to us, as if Martin had dated and mailed his letter on the first day of the week of the weekly period referred to—presumably June 20, 1954. However the reference to the week may be interpreted, the effective renewal date falls within the thirty-day period prescribed by the contract, and hence the notice was a compliance with its terms. Star's argument to the contrary is based on the assumption that Martin's letter is to be construed as giving notice of a renewal to commence with the date of his letter. Since this assumption is erroneous, the contention falls. Likewise falls with it the further contention that Martin must be alive at the time of actually

giving the notice. Its legal effect was conditioned upon his being alive at the time of the effective date of the exercise of the option. Since he was alive at that time the notice was valid.

It follows that the decision below must be reversed and the order of the trial court granting summary judgment must be vacated.

In remanding the cause to the court below, we should add that an examination of the pleadings shows that our decision does not terminate this litigation. Star has pleaded defenses other than those we have passed upon, and it will be open to Star to press any or all of such other defenses as it sees fit.

The cause is remanded to the Superior Court of New Castle County with instructions as above set forth and for further proceedings not inconsistent with this opinion.