The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
January 14, 2021

## 2021COA2

## No. 19CA0438, *McWhinney Centerra v. Poag & McEwen* — Torts — Economic Loss Doctrine — Intentional Torts — Fraudulent Concealment — Intentional Interference with Contractual Obligations — Intentional Inducement of Breach of Contract

A division of the court of appeals considers whether the district court erroneously applied the economic loss rule in dismissing common law intentional tort claims. In light of the Colorado Supreme Court's opinion in *Bermel v. BlueRadios, Inc.*, 2019 CO 31, the division concludes that in most instances the economic loss rule will not bar intentional tort claims.

The division also considers whether a breach of contract occurred, applying Delaware law. The division concludes that a breach of contract did occur in this case.

COLORADO COURT OF APPEALS **2021COA2**

Court of Appeals No. 19CA0438
Larimer County District Court No. 11CV1104
Honorable Thomas R. French, Judge

McWhinney Centerra Lifestyle Center LLC, a Colorado limited liability company,

Plaintiff-Appellee and Cross-Appellant,

v.

Poag & McEwen Lifestyle Centers-Centerra LLC, a Delaware limited liability company,

Defendant-Appellant and Cross-Appellee.

JUDGMENT AFFIRMED, ORDER REVERSED,
AND CASE REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE ROMÁN
Fox and Gomez, JJ., concur

Announced January 14, 2021

Brownstein Hyatt Farber Schreck LLP, Jonathan G. Pray, Denver, Colorado; Hanson Bridget LLP, Gary A. Watt, Adam W. Hofmann, Anthony J. Dutra, San Francisco, California, for Plaintiff-Appellee and Cross-Appellant

Peters Schulte Odil & Wallshein LLC, Jennifer Lynn Peters, Timothy R. Odil, Greeley, Colorado; Senn Visciano Canges P.C., Frank W. Visciano, Charles E. Fuller, Denver, Colorado, for Defendant-Appellant and Cross-Appellee

¶ 1     Poag & McEwen Lifestyle Centers-Centerra LLC (P&M) appeals the district court's judgment in favor of McWhinney Centerra Lifestyle Center LLC (MCLC) on MCLC's contract claim following a trial to the court.  MCLC cross-appeals the district court's order dismissing its tort claims under the economic loss rule.  Applying Delaware law pursuant to the parties' choice of law agreement, we affirm the district court's judgment and award of damages on the breach of contract claim.  Applying Colorado law to the tort claims, we affirm the district court's order dismissing MCLC's civil conspiracy claim.  We reverse, however, the district court's order dismissing MCLC's tort claims of fraudulent concealment, intentional interference with contractual obligations, and intentional inducement of breach of contract and remand for further proceedings.  In reinstating these intentional tort claims, we expressly hold that the economic loss rule generally does not bar these types of common law intentional tort claims and, thus, we decline to follow prior divisions that have held otherwise.

## I.    Background

¶ 2     This action arises from a failed joint venture to build and operate The Promenade Shops at Centerra (the Shops), an upscale

1

shopping center in Loveland. The parties have been in contentious litigation since 2011. Consequently, this case has a complex factual and procedural history.

¶ 3    In 2004, McWhinney Holding Company, LLLP (McWhinney) and Poag and McEwen Lifestyle Centers, LLC (PMLC), through their subsidiaries MCLC and P&M, respectively, formed Centerra LLC to acquire, develop, own, and operate the Shops. MCLC provided the capital, land, and an established public-private partnership with city and county entities for infrastructure financing. P&M served as the managing member of the joint venture. An operating agreement (the Agreement) was created to govern Centerra LLC. MCLC and P&M signed the Agreement, and McWhinney and PMLC signed as guarantors of certain provisions.

¶ 4    The Agreement required P&M to obtain a construction loan for Centerra LLC and later a permanent loan before the maturity of the construction loan. In 2005, P&M obtained a construction loan for $116 million in accordance with the terms of the Agreement, and the Shops opened in October 2005. In 2006, P&M purchased a $155 million forward swap on behalf of Centerra LLC without obtaining a permanent loan. The forward swap in this case was an

2

agreement between Centerra LLC and a bank to exchange interest in February 2008 at a rate of 5.4125 percent.

¶ 5     In 2007, P&M entered into a $40 million mezzanine loan agreement.[1]  The district court found that P&M used the $40 million mezzanine loan for personal interests — namely, for Dan and Josh Poag to buy out their co-founder, Terry McEwen — and that P&M intentionally concealed the buyout and its intention to use these self-dealings to fund it.[2]  The court further found that MCLC was given limited and misleading or no information regarding these dealings.

¶ 6     The mezzanine loan agreement pledged fifty percent of P&M's ownership interest in Centerra LLC to a different subsidiary of

---

[1] Generally, a mezzanine loan is a type of financing that pledges equity in a company to a lender in exchange for a loan.  The plan was that P&M would obtain a mezzanine loan secured by its ownership interests in Centerra LLC, and all of the proceeds from a future permanent loan would go toward paying the mezzanine loan.

[2] The district court found that this agreement gave lenders the impression that P&M would find $155 million in permanent financing before the swap, as that would be necessary to pay the interest, but that P&M was in fact not close to finding a permanent loan in this amount.  At trial, an expert for MCLC testified that "in [his] thirty years in the banking and financing industry he had never seen anyone purchase a forward swap without either having a loan already in place or close to closing."

PMLC, Centerra & Dos Lagos Venture, LLC, who likewise pledged fifty percent of its ownership interest in Centerra LLC to the mezzanine loan lender — I&G Promenade Shops Lender, LLC, which was a subsidiary of the bank.

¶ 7 The district court further found that because of the impending cost of the forward swap and P&M's desire to pay off the mezzanine loan, P&M did not seek a permanent loan below $155 million, despite only needing $116 million to refinance the construction loan. Moreover, the court found P&M did not seek permanent financing after 2007. Centerra LLC was forced to pay $7.5 million to settle the forward swap, and P&M never obtained permanent financing.

¶ 8 In mid-2008, the real estate market collapsed and Centerra LLC defaulted on its construction loan. Ultimately, the Shops were foreclosed by the lender and sold in foreclosure to a third party.

¶ 9 In 2011, after the joint venture failed, MCLC sued P&M, asserting a breach of contract claim based on the Agreement and

seven tort claims.[3] The district court dismissed all seven tort claims under the economic loss rule.[4] In 2014, on interlocutory appeal, a division of this court affirmed the dismissal of four of those claims based on the economic loss rule, and reinstated the other three claims. *See McWhinney Holding Co., LLLP v. Poag & McEwen Lifestyle Ctrs.-Centerra, LLC*, (Colo. App. No. 13CA0850, July 10, 2014) (not published pursuant to C.A.R. 35(f)).[5]

¶ 10     In 2017, and in light of the supreme court's opinion in *Van Rees v. Unleaded Software, Inc.*, 2016 CO 51, MCLC moved for

---

[3] MCLC, McWhinney, Centerra LLC, SMP4 Investments, Inc., and Centerra Retail Sales Fee corporations are listed as plaintiffs on the complaint. P&M, PMLC, and Poag Lifestyle Centers, LLC are listed as defendants. In this opinion we refer to plaintiffs collectively as MCLC and defendants collectively as P&M.

[4] The dismissed tort claims were fraudulent concealment, breach of fiduciary duty, intentional interference with contractual obligations, intentional inducement of breach of contract, two fraudulent inducement claims, and civil conspiracy.

[5] The four dismissed claims the division affirmed were fraudulent concealment, breach of fiduciary duty, intentional interference with contractual obligations, and intentional inducement of breach of contract. The division reinstated the two pre-contractual fraudulent inducement claims. It also reinstated the civil conspiracy claim specifically against Poag Lifestyle Centers, LLC while affirming the dismissal of the civil conspiracy claim against P&M and PMLC.

reconsideration of the dismissal order as to three of its tort claims. The district court denied the motion.

¶ 11     Then, as relevant here, after a thirteen-day bench trial, the district court concluded P&M breached both its fiduciary duties and contractual obligations under the Agreement and awarded $42,006,032.50 to MCLC in damages plus interest.

## II.     Analysis

¶ 12     On appeal, P&M contends the district court erred when it entered judgment in favor of MCLC on MCLC's breach of contract claim. It also challenges the damages awarded based on the breach of contract. MCLC contends on cross-appeal that the district court erred when it dismissed MCLC's fraudulent concealment, intentional interference with contractual duties, intentional inducement of breach of contract, and civil conspiracy tort claims under the economic loss rule. We first discuss P&M's breach of contract claims on appeal *infra* Part II.A, and then turn to MCLC's claim on cross-appeal regarding the economic loss rule, *infra* Part II.B.

## A. P&M's Claims

¶ 13 P&M contends the district court erred when it found P&M breached the Agreement because the court improperly (1) imposed fiduciary duties on P&M; (2) found that P&M breached its obligations under the Agreement; and (3) calculated damages. Applying Delaware law, as the Agreement requires, we examine these contentions.

### 1. Standard of Review and Applicable Law

¶ 14 Parties may contract for the application of a state's law to determine particular issues. *Hansen v. GAB Bus. Servs., Inc.*, 876 P.2d 112, 113 (Colo. App. 1994). Here, the parties agreed that Delaware law would apply. Choice of law is an issue we review de novo. *Paratransit Risk Retention Grp. Ins. Co. v. Kamins*, 160 P.3d 307, 314 (Colo. App. 2007). "[W]e will apply the law chosen by the parties [in their contract] unless there is no reasonable basis for their choice or unless applying the chosen state's law would be contrary to the fundamental policy of the state whose law would otherwise govern." *Target Corp. v. Prestige Maint. USA, Ltd.*, 2013 COA 12, ¶ 14. We will thus apply Delaware law to all substantive

legal matters based in contract law in this case, including the relief granted. *See id.* at ¶¶ 15-16, 18.

¶ 15    However, we apply Colorado law to "all matters of judicial administration, including . . . the rules prescribing how litigation shall be conducted" and the applicable standard of review. *Id.* at ¶¶ 15, 19. And, we review a judgment following a bench trial as a mixed question of fact and law. *Premier Members Fed. Credit Union v. Block*, 2013 COA 128, ¶ 26. "[W]e defer to the trial court's credibility determinations and will disturb its findings of fact only if they are clearly erroneous and are not supported by the record." *Amos v. Aspen Alps 123, LLC*, 2012 CO 46, ¶ 25. We review de novo the court's conclusions of law, *Block*, ¶ 27, including its conclusions on questions of contract interpretation, *Gagne v. Gagne*, 2014 COA 127, ¶ 50.

¶ 16    With regard to the substantive contract law to be applied in this case, under Delaware law, a party is excused from performance of its contractual obligations if the other party commits a material breach of the contract. *BioLife Sols., Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003). The elements of a breach of contract claim are (1) a contractual obligation; (2) a breach of that obligation

8

by the defendants; and (3) resulting damages to the plaintiff. *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 883 (Del. Ch. 2009).

### 2.    Did P&M Owe Fiduciary Duties to MCLC?

¶ 17    We start our analysis by deciding whether P&M owed fiduciary duties to MCLC under the Agreement.  We conclude that it did.

¶ 18    Under Delaware law, the drafters of an LLC may expand, restrict, or eliminate a member or manager's duties, including fiduciary duties.  Del. Code Ann. tit. 6, § 18-1101(c) (West 2020); *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 661 (Del. Ch. 2012).  Unless the LLC agreement's terms include express language to eliminate those duties, Delaware LLC managers owe traditional fiduciary duties of loyalty and care to the LLC and its managers.  *Feeley*, 62 A.3d at 660.  In other words, "[d]rafters of an LLC agreement 'must make their intent to eliminate fiduciary duties plain and unambiguous.'"  *Id.* at 664 (citation omitted).

¶ 19    P&M insists that the drafting of the Agreement before us intended to eliminate its fiduciary duties.  We conclude, however, that no such intention is plainly and unambiguously revealed.  To the contrary, section 6 of the Agreement contemplates P&M's duties as the manager and a member, providing, in relevant part, that

- P&M "will owe a duty in carrying out its duties and responsibilities under this Agreement of good faith, loyalty, and fair dealing to" Centerra LLC;

- P&M "shall manage or cause the affairs of the Company to be managed in a prudent and businesslike manner" but "shall not be restricted in any manner from participating in any other business activities, notwithstanding the fact that the same might be competitive with the business of [Centerra LLC]";

- "[i]n carrying out its powers and duties hereunder, [P&M] shall exercise its best efforts, [and] shall owe a duty of good faith and fair dealing to [Centerra LLC] and to [MCLC]"; and

- P&M "shall not be liable to [Centerra LLC] or [MCLC] for any actions taken on behalf of [Centerra LLC] in good faith and reasonably believed to be in the best interest of [Centerra LLC] or for errors of judgment made in good faith," but shall be liable to Centerra LLC and MCLC for "actions and omissions involving actual fraud, gross negligence, or willful misconduct or from which such Member derived improper personal benefit."

10

¶ 20 The district court found that these provisions, read together with the contract as a whole and in conjunction with Delaware law, meant P&M owed fiduciary duties of care and loyalty to Centerra LLC and MCLC. Based on our reading of *Feeley,* the district court's conclusions are supported by the record and Delaware law.

¶ 21 Not surprisingly then, we reject P&M's assertion that the Agreement expressly eliminates its fiduciary duties to Centerra LLC and MCLC. Simply put, we discern nothing in the contract that conveys P&M's "plain and unambiguous" intent to eliminate fiduciary duties to MCLC. *Id.* Instead, sections 6.1, 6.4, and 6.6 of the Agreement provide that P&M owed fiduciary duties of care and loyalty to Centerra LLC and MCLC. Thus, under Delaware law, the Agreement itself provides for the fiduciary duties P&M owed to MCLC.

¶ 22 Moreover, section 6.6(a) of the Agreement provides that P&M shall be liable for actions or omissions involving "actual fraud, gross negligence, or willful misconduct or from which [P&M] derived improper personal benefit." Once again applying the logic in *Feeley,* the Agreement here "assumes that those obligations already exist" through fiduciary duties. *Id.* at 665.

¶ 23    We also disagree with P&M that the provision in section 6.4(a) of the Agreement that P&M "shall not be restricted in any manner from participating in any other business activities, notwithstanding the fact that the same may be competitive with the business of the company" eliminated or significantly lessened its fiduciary duty of loyalty to MCLC. The district court correctly concluded that this language modified P&M's duty of loyalty but did not displace or eliminate it. Indeed, section 6.1 of the Agreement expressly provides that P&M owed a duty of loyalty to Centerra LLC. Additionally, section 6.6(a) provides relief to MCLC for "actions or omissions involving willful misconduct or from which [P&M] derived improper personal benefit"; this liability stems from an assumed duty of loyalty. *See Feeley*, 62 A.3d at 664-65; *see also Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396-97 (Del. 2010) (noting that contracts must be construed as a whole).

¶ 24    We therefore agree with the district court that P&M owed the fiduciary duties of care and loyalty to MCLC under the Agreement. We next turn to whether the district court's findings of breach of contract were proper.

### 3.   Obligations and Duties Under the Agreement

¶ 25    P&M next asserts the district court erred when it concluded that P&M breached fiduciary duties of care and loyalty to MCLC. Again, we disagree.

¶ 26    The district court found that P&M breached the Agreement on multiple occasions, including when it (1) purchased the forward swap on behalf of Centerra LLC; (2) entered into the $40 million mezzanine loan; and (3) failed to secure permanent financing.  We address each of these findings in turn.

### a.   $155 Million Forward Swap

¶ 27    The district court found that P&M breached its obligations under the Agreement when it purchased the $155 million forward swap on behalf of Centerra LLC.  In so finding, P&M contends the district court contravened the business judgment rule, improperly substituting its own judgment for P&M's.

¶ 28    The business judgment rule in Delaware is based on the presumption that, in making a decision, the manager of a company "acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company." *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 52 (Del. 2006)

13

(quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)). However, this presumption can be rebutted if a plaintiff demonstrates that the manager breached the fiduciary duties of loyalty or care or acted in bad faith. *See id.*

¶ 29　　The duty of loyalty requires that the best interest of the company and its members take precedence over any of the manager's individual interests. *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993). As discussed, while the parties in this case modified the duty of loyalty to allow P&M to participate in "other business activities," the duty of loyalty was not eliminated. Rather, the duty of loyalty here required P&M to affirmatively protect Centerra LLC's interests. *Id.* The duty of loyalty carries the subsidiary requirement that the manager act in good faith. *In re Rural/Metro Corp. Stockholders Litig.*, 102 A.3d 205, 252-53 (Del. Ch. 2014).

¶ 30　　Additionally, the duty of care requires that a manager act on an "informed basis." *In re Walt Disney Co. Derivative Litig.*, 906 A.2d at 52; *In re Rural/Metro Corp. Stockholders Litig.*, 102 A.3d at 252-53. In section 6.4 of the Agreement, the parties in this case

expanded this obligation, requiring P&M to act in a "prudent and businesslike manner."

¶ 31    We are unpersuaded by P&M's contention that the corporate fiduciary duties imposed in the duty cases cited here or by the district court are in any way distinct from the "traditional fiduciary duties" imposed on managers of LLCs. *See Feeley*, 62 A.3d at 660 & n.1.

¶ 32    The district court found that P&M breached the Agreement when it purchased the forward swap on behalf of Centerra LLC but it was not a material breach of the Agreement because it did not "go to the root or essence of the [A]greement." However, the district court found that P&M was nonetheless liable to MCLC because P&M derived an improper personal benefit from the swap because P&M used it "as a tool to obtain the $40 million mezzanine loan."[6]

---

[6] We disagree with P&M's contention that the district court's determination was illogical and inconsistent where the court found that P&M's breach was not material, but was grossly negligent and constituted willful misconduct. The district court's findings that the purchase of the swap was not a material breach means that MCLC was not excused from performance at the time P&M purchased the forward swap and, thus, could not have recovered expectation damages for breach of contract. However, under section 6.6(a) of the Agreement, MCLC is entitled to indemnification

In this regard, the district court found the business judgment rule did not apply because MCLC demonstrated that P&M's decision to enter the forward swap was a breach of P&M's fiduciary duties of loyalty and care.

¶ 33     In support of its findings, the court found the swap breached P&M's duties of loyalty and care because the forward swap was for the individual benefit of P&M, Dan Poag, and Josh Poag, and for PMLC, as it was "an effort by Josh Poag to convince private investors that he had or was close to permanent financing for $155 million so he could obtain $40 million to purchase McEwen's share of the Poag and McEwen businesses."

¶ 34     The district court further found that P&M breached its duty of care to act in a "prudent and businesslike manner" in its management of Centerra LLC.  The court found that evidence presented at trial — including expert testimony that purchasing the swap was a "cart before the horse . . . kind of situation" that was

---

for acts of gross negligence or willful misconduct, or acts from which P&M derived an improper personal benefit — regardless of whether they constituted material breaches or not.  Thus, MCLC was entitled to damages under this provision of the Agreement, as discussed in Part II.A.4.a, *infra.*

"very risky" and "made no sense" and Josh Poag's own testimony that forward swaps generally were "aggressive" and "unnecessarily risky" — established that P&M breached its duty of care.

¶ 35 Contrary to P&M's contentions, the district court did not ignore Delaware's business judgment rule. It made detailed findings, supported by the record, to determine that the business judgment rule was rebutted because P&M breached its duties of loyalty and care to MCLC. Accordingly, we discern no error in the district court's determination that the business judgment rule was rebutted as to the forward swap.

b.    Mezzanine Loan

¶ 36 P&M also contends that the district court erred by finding P&M materially breached the Agreement when it obtained the mezzanine loan. According to P&M, the district court erred by finding that P&M owed MCLC traditional fiduciary duties of care and loyalty. P&M also contends that the court imposed a more onerous disclosure burden than Delaware law requires. But we have already concluded that the district court properly found that P&M owed MCLC traditional fiduciary duties of care and loyalty.

¶ 37    As relevant here, the district court found that "P&M's entry into, and concealment of, the [m]ezzanine [l]oan constituted material breaches of its fiduciary duties to MCLC and Centerra LLC." In support of its findings, the district court found that the loan improperly gave the lending bank "significant authority over the management of Centerra LLC and the Shops" without MCLC's consent. The court further found that this breached P&M's duties of loyalty and good faith, as the decision was "solely for the benefit of [P&M] and was not in the best interest of Centerra LLC." These findings are supported by the record.

¶ 38    The district court also found that P&M purposefully concealed the purpose of the loan — that is, P&M only revealed to MCLC that it was a "corporate financing." The court found that the evidence and testimony was "unequivocal" that P&M wanted to keep the fact that the loan was to buy out McEwen's interest secret from MCLC. Thus, the district court concluded that P&M's conduct was a violation of the duties of fair dealing and candor and constituted "at least willful misconduct" and "may have amounted to fraud." In addition, the district court found that P&M's concealment of significant details, including the effect of the loan on Centerra LLC,

18

and its misrepresentations of material facts while obtaining MCLC's agreement for the loan constituted another breach of fair dealing and candor, that this was willful misconduct, and that P&M derived an improper personal benefit from its actions. These findings, too, are supported by the record.

¶ 39 Finally, the district court found with record support that the mezzanine loan had a negative effect on P&M's ability to obtain permanent financing pursuant to the Agreement, because all permanent financing offers P&M received after 2007 were insufficient to pay off both the mezzanine loan and the construction loan.

¶ 40 We conclude, moreover, that P&M had a duty to disclose material facts related to the mezzanine loan to MCLC. In Delaware, LLC managers are not required to disclose every decision or reason for their decisions, but they must give "a picture that is materially accurate, and in which the imperfections and inconsistencies are not airbrushed away." *Appel v. Berkman*, 180 A.3d 1055, 1061-62 (Del. 2018). This did not happen here.

¶ 41 Section 6.6 of the Agreement explicitly provides that P&M owed a duty of fair dealing to MCLC, which necessarily imposed a

duty of candor — sometimes referred to as a duty of disclosure. *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983). The district court made detailed findings — all supported by the record — that P&M purposefully withheld, concealed, and misrepresented material facts about the loan and its effect on Centerra LLC's operations in order to get MCLC's consent. Thus, we conclude that the district court's findings that P&M failed to give MCLC a complete or accurate picture of how the loan affected the operation of Centerra LLC under the Agreement were supported by the record. We thus affirm the district court's finding that P&M breached its duty of fair dealing to MCLC in obtaining the mezzanine loan.

c.    Failure to Obtain or Provide Notice of a Permanent Loan

¶ 42    P&M next contends that the district court erred when it concluded that P&M breached its obligations to MCLC when P&M failed to obtain or provide notice of a permanent loan before the construction loan's maturity date. In particular, P&M contends the district court erred by concluding that (1) P&M breached the Agreement when it failed to secure permanent financing in 2007; (2) P&M breached the Agreement when it failed to issue a permanent loan impasse notice; and (3) P&M's affirmative defense of

impossibility failed. We agree with the district court's legal conclusions for three reasons.

¶ 43    First, the district court noted section 7.3(a) of the Agreement provides that, prior to the maturity date of the construction loan, P&M "shall submit to [MCLC] in writing the terms proposed for the Permanent Loan, including the maximum loan amount, maturity date, interest rate, fees to the lender, repayment terms and other material terms (the 'Permanent Loan Notice')."

¶ 44    The district court found that P&M breached this contractual obligation when it ultimately failed to secure a permanent loan or submit a proper permanent loan notice prior to the maturity date of the construction loan. The district court found, separately, that P&M breached its fiduciary duties in 2007 when it abandoned its search for permanent financing, which was part of a cascade of breaches stemming from the initial breaches regarding the forward swap and mezzanine loan.

¶ 45    Contrary to P&M's contention, the district court did not conclude that "P&M breached the Agreement by not closing a permanent loan before April 2007." Rather, the district court found that the maturity date for the construction loan was January 23,

2009, and that P&M was obligated to provide notice of permanent financing before that date, which it did not do.

¶ 46    Second, the district court also found that P&M breached its contractual obligations when it failed to give notice of permanent financing before the need for an impasse notice arose under the Agreement.  But even if we assume, without deciding, that the district court erred in this respect, any error was harmless, as it did not "substantially influence[] the outcome of the case." *Laura A. Newman, LLC v. Roberts*, 2016 CO 9, ¶ 3; *see also* C.R.C.P. 61.[7]

¶ 47    Finally, we reject P&M's contention that the district court erred when it rejected P&M's impossibility defense with respect to the permanent loan.  Under Delaware law, a promisor's contractual obligations can be released from liability for breach of contract when further performance is impossible.  *Martin v. Star Publ'g Co.*,

---

[7] The district court found that P&M breached these obligations twice: first, when P&M failed to provide MCLC notice of a permanent loan pursuant to and in compliance with the Agreement; and second, when P&M failed to provide MCLC a permanent loan impasse notice.  The result is the same, however, because the district court based its award of damages on entirely separate breaches — namely, when P&M entered the mezzanine loan without making material disclosures to MCLC, and when P&M purchased the forward swap.

126 A.2d 238, 242 (Del. 1956). This defense is applicable only when the party claiming the defense establishes the impossibility of performance is caused by a fortuitous event and not by an act of the promisor's own volition. *Id.* The Restatement of Contracts defines "impossibility" not only as strict impossibility, but "impracticability because of extreme and unreasonable difficulty, expense, injury, or loss." Restatement (First) of Contracts § 454 (Am. L. Inst. 1932).

¶ 48    In this case, the district court found P&M's impossibility defense failed because there was substantial evidence that it could have obtained a permanent loan for the entire amount of the construction loan. Specifically, the district court found:

- P&M received "numerous" permanent loan offers in 2006 and 2007 that would have fully paid off the construction loan;

- P&M was able to secure permanent financing for another, similar property with similar occupancy during that period; and

- there were loans available in 2008 and 2009, and, even if those loans did not have favorable terms, they would have

allowed P&M to substantially perform its obligations in the Agreement.

¶ 49     The district court then concluded that, because P&M "waited too long and sought to leverage the property too high," it was ultimately responsible for the breach and failed to establish impossibility. The record supports the district court's findings.

¶ 50     P&M passed on multiple opportunities for permanent financing that were available through January 2009. *See In re BankAtlantic Bancorp, Inc. Litig.*, 39 A.3d 824, 846 (Del. Ch. 2012) ("[A] party cannot 'abrogate a contract, unilaterally, merely upon a showing that it would be financially disadvantageous to perform it . . . .'") (citation omitted). Thus, P&M failed to establish its own actions were not the cause of its ultimate failure to perform and, therefore, its impossibility defense fails. *Martin*, 126 A.2d at 242.

¶ 51     Accordingly, we affirm the district court's supported findings that P&M breached its contractual obligations.

¶ 52     Having affirmed the district court's conclusion that P&M breached its contractual obligations under the Agreement, we next consider whether the calculation of damages was correct.

### 4.    Calculation of Damages

¶ 53    P&M next contends the district court erred when it calculated MCLC's damages related to (1) funds lost as a result of P&M's decision to enter a forward swap and (2) MCLC's lost equity as a result of P&M's breach.[8]

¶ 54    The proper measure of damages presents a question of law subject to de novo review.  *Taylor Morrison of Colo., Inc. v. Terracon Consultants, Inc.*, 2017 COA 64, ¶ 23.  However, "[i]n determining the issues of causation of injury, the trier of fact is vested with broad discretion and its assignment . . . will not be set aside absent a showing that it abused that discretion."  *Vento v. Colo. Nat'l Bank-Pueblo*, 907 P.2d 642, 646 (Colo. App. 1995).  We further afford the district court's damages award "considerable deference and will set it aside only if clearly erroneous."  *Colo. Ins. Guar. Ass'n v. Sunstate Equip. Co.*, 2016 COA 64, ¶ 128 (*cert. granted in part* Oct. 31, 2016).

¶ 55    Under Delaware law,

> the standard remedy for breach of contract is based upon the reasonable expectations of the parties *ex ante*.  This principle of expectation

---

[8] The district court also awarded damages related to the costs of P&M's improper tax appeal.  P&M does not challenge this determination on appeal.

> damages is measured by the amount of money that would put the promisee in the same position as if the promisor had performed the contract. Expectation damages thus require the breaching promisor to compensate the promisee for the promisee's reasonable expectation of the value of the breached contract, and, hence, what the promisee lost.

*Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001) (footnote omitted).

¶ 56    Because contract damages are based on the injured party's expectation interest, the extent of the loss is determined in reference to the plaintiff's particular circumstances. *See* Restatement (Second) of Contracts § 347 (Am. L. Inst. 1981); *see also Duncan*, 775 A.2d at 1022 (adopting the Restatement (Second) of Contract's definition of expectation damages). Courts must (1) quantify the loss suffered by the injured party, measured at the date of the breach; and (2) subtract the costs or other losses avoided by the non-breaching party. Restatement (Second) of Contracts § 347 cmts. a, b.

¶ 57    We turn now to the district court's calculation of damages related to the swap and MCLC's lost equity.

### a.  Forward Swap

¶ 58  The district court found P&M breached the Agreement by purchasing the forward swap.  *See supra* Part II.A.3.a.  Because the district court made detailed findings supported by the record that the decision to purchase the swap caused MCLC's loss, as opposed to falling interest rates as P&M contends, we affirm its award of damages for half of the loss that resulted from the swap — $3.75 million.  *See Henkel Corp. v. Innovative Brands Holdings, LLC*, No. CIV.A. 3663-VCN, 2013 WL 396245, at *4 (Del. Ch. Jan. 31, 2013) (unpublished opinion) ("Expectation damages are calculated as the amount of money that would put the non-breaching party in the same position that the party would have been in had the breach never occurred.").

### b.  Lost Equity

¶ 59  The district court calculated damages based on its finding that P&M materially breached the Agreement on April 23, 2007, when it entered the mezzanine loan agreement.  The court then measured the value of the breach based on the value of the Shops on that date — $192.5 million — and then subtracted the $116 million construction loan in place at the time of breach.  The district court

accordingly concluded the Shops were valued at $76.5 million and MCLC's equity was half that amount — $38.25 million. Therefore, the district court awarded MCLC $38.25 million for its lost equity in Centerra LLC.

¶ 60 According to P&M, the district court's conclusion that P&M's breach caused MCLC's lost equity required a series of improperly speculative conclusions and ignored the 2008 financial crisis as a proximate, intervening cause of MCLC's loss. We discern no error.

¶ 61 Contrary to P&M's contentions, the district court considered causation at length as follows:

> (1) Josh Poag and Dan Poag, through P&M, used [Centerra LLC] and the Shops to secretly secure a $40 million loan from [the bank], and used the proceeds of that loan to buy out McEwen's interest in P&M;
>
> (2) The Poags, through P&M, intentionally kept important details and the purpose of the $40 million loan from McWhinney for more than two years;
>
> (3) The $40 million loan agreement secretly gave [the bank] significant authority to make management decisions for [Centerra LLC]. This change in decision making amounted to de facto changes in the Operating Agreement. McWhinney did not consent [to] or know of these changes when they were agreed to by P&M;

28

(4)     The proceeds from the $40 million loan were used solely for the benefit of P&M and the Poags, and did not benefit the Shops, [Centerra LLC], or McWhinney;

(5)     As part of the $40 million loan, P&M required MCLC to sign an amendment to the Operating Agreement.  However, P&M obtained the consent of MCLC without disclosing material facts concerning the $40 million loan;

(6)     P&M failed to disclose to McWhinney that in order to get the loan, P&M had to approve agreements giving [the bank] veto power over the future refinancing of the construction loan;

(7)     P&M obtained the $40 million loan proceeds and immediately used those proceeds to acquire McEwen's ownership interest in P&M;

(8)     Days after P&M received and paid the $40 million to McEwen in 2007, P&M secretly informed [the bank] that P&M was no longer interested in obtaining a permanent loan for the Shops and [Centerra LLC], and then demanded McWhinney purchase P&M's interest in [Centerra LLC];

(9)     After that time, P&M did not make good faith efforts to obtain permanent financing for [Centerra LLC] before [Centerra LLC] defaulted on the Construction Loan;

(10)  . . . Josh Poag, on behalf of P&M, told the CFO for P&M that he "let the [construction] loan go into default" and that he "had the ability to get a permanent loan" before the default on the Construction Loan;

(11) P&M's inability to secure permanent financing before April 2007 was the result of its attempts to secure a loan which would pay off the $116 million construction loan and pay $40 million to P&M so that it could buy out McEwen's interest in P&M. . . .

¶ 62     The district court further found that

> [t]his series of breaches between 2006 and 2010 also resulted in, led to, and caused losses because if P&M had not actively concealed their breaches from [MCLC], [MCLC] would have fired P&M as the manager pursuant to Section 6.5 of the Operating Agreement, and [MCLC] would have obtained permanent financing for the Shops in 2006 or 2007, which would have avoided foreclosure of the Shops.

The district court also rejected P&M's claim that the 2008 financial crisis was the cause of MCLC's loss, finding that the mezzanine loan prevented P&M from finding permanent financing by the deadline and that, while the financial crisis would have made it difficult or less profitable to obtain a permanent loan, it was not an impossibility. *See supra* Part II.A.3.b-c. Because these findings are supported by the record, we discern no error.

¶ 63     We also reject P&M's contention that the district court erred in its method of calculating MCLC's expectation damages. While "expectation damages must be proven with reasonable certainty . . .

the injured party need not establish the amount of damages with precise certainty 'where the wrong has been proven and injury established.'" *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1131 (Del. 2015) (citation omitted).  Further, a court may use post-breach evidence "in order to aid in its determination of the proper expectations as of the date of the breach."  *Id.* at 1133.

¶ 64    Here, the district court attributed MCLC's lost equity in Centerra LLC to P&M's first material breach in April 2007, and, accordingly, it calculated damages based on that date.  Because Centerra LLC's value fluctuated at the time of breach, the district court took the average of the value of the Shops over the year surrounding the breach.  We conclude this method of calculating damages was not speculative — it was a "sparing[]" use of post-breach evidence to determine MCLC's proper expectations at the time of breach.  *Id.*  Contrary to P&M's contentions, the district court properly ignored post-breach evidence — namely, the rising value of the Shops, and then the financial crisis — as irrelevant to discerning MCLC's approximate equity in Centerra LLC at the time of breach.  Accordingly, because the district court's method of

calculating damages complied with Delaware's law on expectation damages, we affirm.

¶ 65     We now turn to MCLC's cross-appeal.

## B.     MCLC's Cross-Appeal

¶ 66     On cross-appeal, MCLC contends that the district court erred by dismissing MCLC's common law intentional tort claims after applying the economic loss rule.  Based on *Van Rees*, 2016 CO 51, and *Bermel v. BlueRadios, Inc.*, 2019 CO 31, MCLC further contends that a division of this court on interlocutory appeal erred when it affirmed the district court's dismissal in *McWhinney Holding*, No. 13CA0850.  With one exception, we agree with MCLC.

¶ 67     Departing from prior divisions, we conclude today that in most instances the economic loss rule will not bar intentional tort claims. Accordingly, with the exception of the civil conspiracy claim, we deem the interlocutory decision in this case no longer sound because of changed conditions of law that substantially alter the application of the economic loss rule in Colorado.[9]

---

[9] We are aware that, in a case involving separate claims, the same parties presented the same issue to a federal district court.  In that case, the district court concluded that *Bermel* substantially

### 1. Standard of Review and Applicable Law

¶ 68    We review a district court's grant of a motion to dismiss de novo, "accepting the factual allegations contained in the complaint as true and viewing them in the light most favorable to the plaintiff." *Van Rees,* ¶ 9.

¶ 69    While the Agreement is governed by and construed in accordance with Delaware law, we agree with the district court and the division of this court on interlocutory appeal that the choice of law provision of the Agreement applies only to contract claims, and not to related tort claims. *McWhinney Holding*, No. 13CA0850, slip op. at 7. Accordingly, Colorado law applies. *See URS Grp., Inc. v. Tetra Tech FW, Inc.*, 181 P.3d 380, 391 (Colo. App. 2008) (applying New Jersey law, based on a contractual choice of law provision, to contract claims, but applying Colorado law to tort claims).

¶ 70    "When a court issues final rulings in a case, the 'law of the case' doctrine generally requires the court to follow its prior relevant

---

changed the economic loss rule in Colorado and stands for the proposition that "intentional torts depend on duties independent of contract and therefore are not barred by the economic loss rule." *Mcwhinney Holding Co., LLLP v. Poag*, Civ. A. No. 17-CV-02853-RBJ, 2019 WL 9467529, at *2 (D. Colo. Dec. 6, 2019).

rulings." *Giampapa v. Am. Fam. Mut. Ins. Co.*, 64 P.3d 230, 243 (Colo. 2003). However, the law of the case doctrine is "merely discretionary when applied to a court's power to reconsider its own prior rulings." *Id.* "[A] court may decline to apply the doctrine if a previous decision is no longer sound because of changed conditions of law." *Id.* (stating that the court of appeals should have declined to apply the law of the case doctrine to its own prior decision in the same case in light of significant developments in the law).

¶ 71    In Colorado, the economic loss rule provides that "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." *Town of Alma v. AZCO Constr., Inc.,* 10 P.3d 1256, 1264 (Colo. 2000). The purpose of the rule is to "maintain a distinction between contract and tort law." *Id.* at 1262. "To decide whether the economic loss rule bars a tort claim, courts must first determine the source of the duty at issue." *Bermel*, ¶ 53 (Gabriel, J., dissenting).

¶ 72    As the supreme court has made clear, tort claims based on theories of negligence and negligent misrepresentation necessarily stem from duties created by a contract between parties and,

34

therefore, the economic loss rule often applies. *See Town of Alma,* 10 P.3d at 1264-65 (negligence); *BRW, Inc. v. Dufficy & Sons, Inc.,* 99 P.3d 66, 67-68 (Colo. 2004) (negligence and negligent misrepresentation); *Grynberg v. Agri Tech, Inc.,* 10 P.3d 1267, 1268 (Colo. 2000) (negligence).

¶ 73    This same principle, however, works in the opposite direction when it comes to common law intentional torts. In *Bermel,* ¶ 37, the supreme court held that the economic loss rule did not bar a tort claim where a state statute created a cause of action. The court's opinion hinged on a concern that interpreting the economic loss rule — a judicially created doctrine — to bar a statutory claim would undermine separation of powers principles. *Id.* at ¶ 20 n.6. But, in reviewing its own case law on the economic loss rule, the court pointed out that it had only ever applied the economic loss rule "to bar common law tort claims of negligence or negligent misrepresentation." *Id.* at ¶ 21.

¶ 74    While the supreme court's decision in *Bermel* was limited to statutory tort claims, we conclude the court's opinion is instructive on the economic loss rule's applicability to common law intentional tort claims. Notably, the *Bermel* court observed that "[a]lthough our

cases have emphasized the need to 'prevent tort law from "swallowing" the law of contracts,' we have been equally clear that we must also 'be cautious of the corollary potential for contract law to swallow tort law.'" *Bermel*, ¶ 20 n.6 (first quoting *Town of Alma*, 10 P.3d at 1260; and then quoting *Van Rees*, ¶ 19). The *Bermel* court elaborated that "the economic loss rule generally should not be available to shield intentional tortfeasors from liability for misconduct that happens also to breach a contractual obligation." *Id.*; *see also Van Rees*, ¶ 12 (concluding that the economic loss rule did not necessarily apply where a party's tort claims were related to contractual obligations, but the tort claims flowed from an independent duty under tort law).[10]

---

[10] While we acknowledge that, generally, parties may agree to exculpatory provisions in contracts that may shield tortfeasors from liability, we note that such provisions are subject to the close scrutiny of reviewing courts. *See Bermel v. BlueRadios, Inc.*, 2019 CO 31, ¶ 20 n.6; *see also Jones v. Dressel*, 623 P.2d 370, 376 (Colo. 1981); *Rhino Fund, LLLP v. Hutchins*, 215 P.3d 1186, 1191 (Colo. App. 2008) ("Most courts will not enforce exculpatory and limiting provisions . . . if they purport to relieve parties from their own willful, wanton, reckless, or intentional conduct.").

## 2. Discussion

¶ 75 With these principles in mind, we conclude that the district court erred when it applied the economic loss rule to bar MCLC's common law intentional tort claims of fraudulent concealment, intentional interference with contractual obligations, and intentional inducement of breach of contract because each of these claims stems from a duty based in tort law independent of the Agreement.[11] While the conduct underlying each of these claims may also support a breach of contract claim in this case, we are not persuaded that the economic loss rule should "shield intentional tortfeasors from liability for misconduct that happens *also* to breach a contractual obligation." *Bermel*, ¶ 20 n.6 (emphasis added).

¶ 76 Nonetheless, we agree with the district court that the economic loss rule barred MCLC's civil conspiracy claim. MCLC alleged P&M and PMLC conspired to breach the Agreement. As signatories to the contract, however, P&M and PMLC's duty not to

---

[11] We note that MCLC's claims of interference with contractual obligations and intentional inducement of breach of contract alleged P&M interfered with MCLC's performance of, or induced MCLC's breach of, contracts that were separate from the Agreement.

conspire to breach the contract stemmed solely from the Agreement itself. *See Logixx Automation, Inc. v. Lawrence Michels Fam. Tr.*, 56 P.3d 1224, 1231 (Colo. App. 2002); *see also Grynberg*, 10 P.3d at 1268 (noting that the focus in an analysis under the economic loss rule is on the source of the duties alleged to have been breached). In other words, P&M and PMLC had no independent duty in tort law not to conspire to breach the Agreement with another signatory to the Agreement. Thus, the economic loss rule bars MCLC's civil conspiracy claim. *See Top Rail Ranch Ests., LLC v. Walker*, 2014 COA 9, ¶ 40 (economic loss rule barred claim against an individual who was a member of the contracting entity).

¶ 77    *Town of Alma* supports our conclusion that, generally, the economic loss rule does not bar common law intentional tort claims. There, the supreme court acknowledged that fraud claims are based on violations of independent duties rather than contractual ones. *Town of Alma,* 10 P.3d at 1263 ("We have also recognized that certain common law claims that sound in tort and are expressly designed to remedy economic loss may exist independent of a breach of contract claim."); *see also Glencove Holdings, LLC v. Bloom* (*In re Bloom*), ___ B.R. ___, 2020 WL

5507485, at *46 (Bankr. D. Colo. Sept. 10, 2020) (interpreting *Bermel* and *Town of Alma* to conclude that "intentional torts depend on duties independent of contract and thus are not barred by the economic loss rule").

¶ 78    We recognize that our conclusion today is contrary to a trilogy of conclusions from divisions of this court that concluded the economic loss rule barred common law intentional tort claims similar to the claims raised in this case. *See Hamon Contractors, Inc. v. Carter & Burgess, Inc.*, 229 P.3d 282, 289 (Colo. App. 2009), *as modified on denial of reh'g* (June 11, 2009) (concluding that the "economic loss rule can apply to fraud or other intentional tort claims based on post-contractual conduct"); *Former TCHR, LLC v. First Hand Mgmt. LLC*, 2012 COA 129, ¶ 29 (holding that the economic loss rule barred fraud and concealment claims because they did not arise out of an independent duty); *Walker*, ¶ 40. However, those divisions did not have the benefit of *Bermel* to guide their analysis. Thus, we decline to follow them. *See People v. Zubiate*, 2013 COA 69, ¶ 48 (we are not bound by another division's holding), *aff'd*, 2017 CO 17.

¶ 79 As discussed, our conclusion is also largely contrary to another division's conclusions on interlocutory appeal from this case. *See McWhinney Holding*, No. 13CA0850. Because of the significant developments in the law pertaining to the economic loss rule's applicability to intentional torts, we decline to follow the law of the case here. *See Giampapa*, 64 P.3d at 243.

¶ 80 Accordingly, we conclude that the district court erred when it applied the economic loss rule to dismiss MCLC's claims of fraudulent concealment, intentional interference with contractual obligations, and intentional inducement of breach of contract. We thus reverse and reinstate those claims.

### III. Conclusion

¶ 81 We affirm the judgment and award of damages in the breach of contract claim. We affirm the order dismissing MCLC's tort claim of civil conspiracy, but we reverse the order dismissing MCLC's tort claims of fraudulent concealment, intentional interference with contractual obligations, and intentional inducement of breach of contract, and remand for further proceedings on those claims.

JUDGE FOX and JUDGE GOMEZ concur.