The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
August 26, 2021

## 2021COA114

**No. 20CA254, Owners Ins. v Dakota Station II — Insurance;
Arbitration — Colorado Uniform Arbitration Act — Vacating
Award — Appraisers — Impartiality**

A division of the court of appeals considers a novel issue of

state law: Where an insurance policy's appraisal provision requires

the agreement of at least one impartial appraiser for an award to be

binding, does the lack of impartiality by the only appraiser to agree

to the award invalidate the award? The division concludes that it

does. The division also concludes that the trial court didn't violate

the law of the case in addressing the issues remanded from a prior

appeal, didn't reversibly err in any of the rulings challenged on

appeal, applied the correct legal standards in its decision, and made

factual findings regarding an appraiser's impartiality that are

supported by the record. The summaries of the Colorado Court of

Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

Accordingly, the division affirms the trial court's judgment vacating an umpire's appraisal award.

Court of Appeals No. 20CA0254
Jefferson County District Court No. 15CV31037
Honorable Laura A. Tighe, Judge

Owners Insurance Company, a Michigan corporation,

Petitioner-Appellee,

v.

Dakota Station II Condominium Association, Inc., a Colorado nonprofit
corporation,

Respondent-Appellant.

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE GOMEZ
Furman and Tow, JJ., concur

Announced August 26, 2021

Spencer Fane LLP, Terence M. Ridley, Evan B. Stephenson, Kayla L. Scroggins-
Uptigrove, Denver, Colorado; Wheeler Law P.C., Karen H. Wheeler, Greenwood
Village, Colorado, for Petitioner-Appellee

Orten Cavanaugh Holmes & Hunt, LLC, Jonah G. Hunt, Joseph A. Bucceri,
Denver, Colorado, for Respondent-Appellant

¶ 1     This is the second appeal to this court in an insurance dispute between Owners Insurance Company (Owners) and Dakota Station II Condominium Association, Inc. (Dakota).  This appeal requires us to address a novel issue of state law: Where an insurance policy's appraisal provision requires the agreement of at least one impartial appraiser for an award to be binding, does the lack of impartiality by the only appraiser to agree to the award invalidate the award?  Because we conclude that it does and because the trial court properly determined that the only appraiser who agreed to the appraisal award was not impartial, we affirm the trial court's judgment vacating the award.

## I.     Background

¶ 2     Dakota, which represents the owners of a forty-nine-building residential property, filed two claims with its insurer, Owners, after the property sustained storm damage.  When the parties couldn't agree on the amount of the damage, Dakota invoked the appraisal provision in the insurance policy.

¶ 3     That provision reads, in relevant part, as follows:

> If [Owners] and [Dakota] disagree on the value
> of the property or the amount of loss, either
> may make written demand for an appraisal of

1

the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding.

¶ 4 Dakota hired Scott Benglen to serve as its public adjuster to handle the claims. Benglen, who was working on a contingency basis and thus had a financial interest in the claims' outcome, retained Laura Haber initially as a policy and damage expert and later as Dakota's appraiser. Haber's contract included a fee cap provision that would limit her fees, incurred on an hourly basis, to "5% of the total replacement cost value." The contract included lines for the parties to initial that term but no one did so.

¶ 5 In accordance with the appraisal procedure, the parties' respective appraisers submitted their estimates and the umpire issued an award adopting some estimates from each appraiser. The umpire adopted Owners' appraiser's estimates in four contested categories and adopted Haber's estimates in the other two, including the largest contested category of roof repair, for a total

award of about $3 million.  The umpire and Haber both signed agreeing to the award, and Owners paid it.

¶ 6     Owners later filed a motion to vacate the appraisal award under section 13-22-223, C.R.S. 2020, of the Colorado Uniform Arbitration Act (CUAA), alleging, among other things, that Haber wasn't impartial, as required by the policy.

¶ 7     The trial judge conducted an evidentiary hearing and then issued oral findings and conclusions denying the motion.  He retired shortly thereafter, and another judge reduced the oral rulings to writing.  In those rulings, the court determined that appraisers aren't subject to the same impartiality requirements as umpires or arbiters but, instead, are expected to base their decisions on their experience and investigation (much like expert witnesses) and not let their findings be influenced by the side for whom they work.  The court found that, under this standard, Haber hadn't acted improperly on any of the grounds asserted by Owners, including that she allegedly (1) visited the property and met with Benglen and Dakota's board of directors before being appointed as the appraiser; (2) had a partnership relationship with Benglen; (3) failed to disclose roof damage that had occurred before the policy

period; (4) included in her estimate damage that had occurred after the policy period, when Dakota was no longer insured by Owners; and (5) operated under a contract capping her fee at 5% of the appraisal award.

¶ 8     As to the last issue regarding the fee cap, the court found that neither party thought the cap applied to this case; the fee would've been under 2% of the award no matter which figures the umpire adopted, so the cap "didn't come into play"; if it had come into play, the court likely would've enforced it notwithstanding the parties' failure to initial that provision; and a fee cap contract doesn't itself establish bias as a matter of law.

¶ 9     A split division of this court affirmed. *Owners Ins. Co. v. Dakota Station II Condo. Ass'n*, 2017 COA 103 (*Owners Ins. I*). The majority largely agreed with the impartiality standard employed by the trial court but concluded that an appraiser can favor one side more than the other. *Id.* at ¶¶ 20-26. Applying this standard, it affirmed all of the trial court's findings. *Id.* at ¶¶ 27-69. In a partial dissent, Judge Terry wrote that she would employ an impartiality standard precluding appraisers from advocating for the party who selects them, would reverse and remand for further findings on

4

whether Haber was impartial under that standard, and would direct that "[i]f [Haber] lacked the requisite impartiality, the damages award should be vacated." *Id.* at ¶¶ 77, 82 (Terry, J., concurring in part and dissenting in part).

¶ 10    The supreme court reversed, concluding that the division majority had employed the wrong standard of impartiality. *Owners Ins. Co. v. Dakota Station II Condo. Ass'n*, 2019 CO 65, ¶¶ 38-44 (*Owners Ins. II*). In doing so, the court established the applicable standard for appraiser impartiality: the policy language "requires the appraiser to be unbiased, disinterested, without prejudice, and unswayed by personal interest" and to "not favor one side more than the other." *Id.* at ¶ 44. It also offered guidance on the distinction between advocating for a party (which is not allowed) and advocating for the appraiser's position (which is):

> An appraiser can certainly explain her position without running afoul of the provision's impartiality requirement. An appraiser may, for example, defend her choice of methodology or use of certain data. Conversely, an appraiser may explain why she feels another appraiser's methodology or use of data is wrong. In neither instance would the appraiser necessarily be acting as an advocate *on behalf of* a party to the dispute. An appraiser advocates *for* or *on behalf of* a party

when her actions are motivated by a desire to benefit a party. For example, if an appraiser simply seeks top dollar for a client, that is improper. In contrast, explaining a position or defending a choice in methodology can be motivated by a desire to reach an accurate outcome.

*Id.* at ¶ 44 n.5. The supreme court remanded the case for the trial court to "determine whether Dakota's appraiser's conduct conformed to [this] standard." *Id.* at ¶ 44.

¶ 11 The supreme court also considered the significance of the fee cap. The court agreed with the division majority's statement that "we see no basis for concluding that [the appraiser]'s impartiality was compromised by this [5%] fee cap when [5%] of the final appraisal was far in excess of the actual billed fees and the contract provision was not invoked." *Id.* at ¶ 48 (quoting *Owners Ins. I*, ¶ 55). The court added that, "[i]n such a case, where the appraiser didn't believe the cap was in effect and there is seemingly no relationship between the fees billed by the appraiser and the estimates she put forth, we can't say that hypothetical incentives rendered her partial." *Id.* Thus, the court concluded, "while we are wary of the possible incentives these agreements create, we decline to hold that they render appraisers partial as a matter of law." *Id.*

6

¶ 12    The case then returned to the trial judge who had reduced the initial oral ruling to writing, and the judge set the matter for a new evidentiary hearing.  But the parties couldn't agree on the scope of the remand — in particular, whether another evidentiary hearing was warranted, what evidence was relevant in such a hearing, and the extent to which the court could reconsider the earlier findings. Dakota argued that no hearing was warranted, filed motions to exclude some of Owners' anticipated evidence, and urged the court not to reconsider the earlier findings.

¶ 13    The court didn't rule on the motions before the start of the hearing but instructed Dakota's counsel to raise the issues as they came up.  At the start of the hearing, the court said that its role was "to determine whether [Haber]'s conduct conformed to that of impartial appraiser"; that it would revisit the earlier findings in considering this issue under the appropriate standard; and that, while the supreme court had ruled that the fee cap didn't by itself render Haber biased, the cap still could be relevant if it motivated Haber to advocate for Dakota.  Dakota's counsel disagreed with the court's directives and asked for a stay to allow it to file a C.A.R. 21

petition asking the supreme court to weigh in on the issues. The court denied the stay and proceeded with the hearing.

¶ 14    After the hearing, the remand court issued new findings and conclusions finding that Haber wasn't impartial, reasoning that Haber was not a credible witness and that there were "multiple examples of her advocacy and overall failure to act in an unbiased, disinterested, and unswayed by personal interest [manner]." The court made detailed findings of partiality, separated into three categories: (1) biased and acting as an advocate; (2) interested; and (3) swayed by personal interest.

¶ 15    In the first category — bias and advocating for Dakota — the court found that

- during and after the appraisal, Haber didn't believe it was important for appraisers to be unbiased (although at the remand hearing she changed her testimony on this point and said she previously had "lost [her] mind");

- Haber testified that she could advocate and remain unbiased, that it's "natural" for appraisers to advocate for insureds, and that it would be appropriate for her to "favor" Dakota if it was a close call;

- Haber said she couldn't remember getting instructions from Benglen about what to include in her appraisal, how to handle the umpire, and how to present her appraisal to the umpire — yet other witnesses testified to these facts, which show Haber was motivated by a desire to help Dakota[1]; and

- Haber refused to answer whether it was appropriate for an appraiser to decide on the outcome of a claim before evaluating the claim.

¶ 16    In the second category — interest — the court found that

- Haber denied or couldn't remember Benglen urging her to include losses from a later storm in her appraisal so as to take advantage of Owners' more favorable policy compared with the policy in effect during the storm;

- Haber conceded at the hearing that the later losses should've been part of a separate claim — yet there was no evidence she had tried to distinguish those losses from the losses occurring during the policy period;

---

[1] The remand court found that Benglen had prodded Haber to "go in at $4.5 million" with her estimate and that she ultimately provided a total estimate to the umpire of nearly $4.4 million, which was within "Benglen's targeted range."

- Benglen held Haber out as an expert on insurance policies (specifically, on maximizing insurance damage estimates);

- Haber had sued Owners in a separate matter; and

- Haber said she didn't recall advising Dakota that she was "very confident" in a positive outcome on the claims but denied that such a statement would be inappropriate.

¶ 17 And, as to the third category — swayed by personal interest — the court found that

- Haber acted as Benglen's "business associate" or "partner" at the same time she was acting as Dakota's appraiser;

- Benglen introduced Haber as his "associate," and she never corrected him;

- Haber didn't disclose her association with Benglen to Owners; and

- Haber's conduct under the fee cap agreement was "subject to review in terms of the impartiality requirement" and, at a minimum, four line items in her appraisal represented overreaching to gain personal interest — (1) ridge caps, when there weren't any before the covered storm events; (2) re-nailing roof sheathing, when she admitted the county

doesn't require it and she had no proof it was needed;

(3) skylight replacement, when there was insufficient evidence to show the skylights were damaged; and

(4) satellite dish remounting, when there wasn't evidence that any satellite dish was mounted on any roof.

¶ 18 Based on all these findings, the court found that "Haber's conduct in estimating this loss smacks of unabashed advocacy" and "is the antithesis of that of an impartial appraiser." Thus, the court concluded, her conduct didn't meet the impartiality standard from *Owners Insurance II* and the appraisal award had to be vacated. It entered judgment accordingly.

## II. Analysis

¶ 19 Dakota contends that the remand court erred in four ways: (1) by failing to follow the law of the case; (2) through its rulings (or failure to rule) on pre-hearing motions, a requested stay, and evidentiary objections; (3) by applying the wrong legal standard; and (4) by making unsupported factual findings. We consider each contention in turn.

11

## A.	Law of the Case

¶ 20	Dakota contends that the remand court failed to follow the law of the case in its proceedings on remand.  We are not persuaded.

¶ 21	We review de novo whether a trial court correctly followed the law of the case.  *Thompson v. Catlin Ins. Co. (UK) Ltd.*, 2018 CO 95, ¶ 20; *Woodbridge Condo. Ass'n, Inc. v. Lo Viento Blanco, LLC*, 2020 COA 34, ¶ 25, *aff'd*, 2021 CO 56.

¶ 22	The law of the case doctrine contains two branches, which we analyze differently depending on whether the prior law of the case involves the court's own rulings or the rulings of a higher court. *Hardesty v. Pino*, 222 P.3d 336, 339 (Colo. App. 2009).

¶ 23	The first branch, referred to generally as the law of the case, "'expresses the practice of courts generally to refuse to reopen what has been decided,' and has been described as a 'discretionary rule of practice.'"  *People v. Morehead*, 2019 CO 48, ¶ 10 (quoting *People ex rel. Gallagher v. Dist. Ct.*, 666 P.2d 550, 553 (Colo. 1983)).  This doctrine doesn't prevent a court from revisiting its own prior rulings, particularly where those rulings are no longer sound due to changed conditions of law.  *See Stockdale v. Ellsworth*, 2017 CO 109, ¶ 37; *McWhinney Centerra Lifestyle Ctr. LLC v. Poag & McEwen*

12

*Lifestyle Centers-Centerra LLC*, 2021 COA 2, ¶ 70.  Additionally, the doctrine applies only to decisions of law — not to the resolution of factual questions.  *S. Cross Ranches, LLC v. JBC Agric. Mgmt., LLC*, 2019 COA 58, ¶ 40.

¶ 24    The second branch, known as the mandate rule, is not discretionary.  *State ex rel. Weiser v. Castle L. Grp., LLC*, 2019 COA 49, ¶ 25.  Under the mandate rule, "[c]onclusions of an appellate court on issues presented to it as well as rulings logically necessary to sustain such conclusions become the law of the case," which the trial court must follow on remand.  *Id.* (quoting *Super Valu Stores, Inc. v. Dist. Ct.*, 906 P.2d 72, 79 (Colo. 1995)).  This rule likewise requires us to follow the supreme court's mandate.  *See People v. Wise*, 2014 COA 83, ¶ 8.

¶ 25    We disagree with Owners' argument that Dakota waived and withdrew this argument in the remand court.  Dakota's counsel repeatedly objected to the scope of the remand proceedings.  While at one point counsel conceded that it was "fine" if the court believed additional evidence would be helpful in deciding the issues, counsel maintained that the scope of any such evidence and the remand proceedings generally should be limited.  Accordingly, we discern no

waiver. *See In re Marriage of Schlundt*, 2021 COA 58, ¶ 18 ("To establish waiver, there must be a clear, unequivocal, and decisive act by the party against whom waiver is asserted.").

¶ 26 Dakota makes four arguments challenging the remand court's compliance with the law of the case. None are persuasive.

¶ 27 First, Dakota argues that the remand court failed to defer to the initial findings that were affirmed by the division majority and not reviewed by the supreme court. Essentially, it argues that the supreme court reviewed only the appraiser impartiality standard and fee cap issues and, thus, the other issues affirmed by the division majority remain the law of the case. But the supreme court's articulation of the correct impartiality standard — which differed from the standards applied by the trial court in the earlier decision and by the division majority in the prior appeal — necessarily affected all the issues going to Haber's partiality. The remand court therefore appropriately followed the supreme court's direction to determine whether Haber's conduct conformed to this new standard. *See Owners Ins. II*, ¶ 44. Indeed, while the remand court had discretion to decide whether another evidentiary hearing was warranted, the supreme court's remand instructions required it

to reassess whether Haber's conduct conformed to the newly articulated standard for impartiality — and, had it not done so, it would have violated the mandate rule.

¶ 28    Moreover, Dakota's argument misunderstands the nature and impact of appellate decisions regarding factual matters. Appellate courts are not fact finders. If an appellate court affirms a trial court's findings of fact, that decision doesn't set those findings in stone. It is merely a determination that the findings were supported by the record and not clearly erroneous. *See Woodbridge Condo. Ass'n*, ¶ 24. A trial court remains free to reconsider its own factual findings later in the case, as long as doing so is consistent with the mandate. *Cf. S. Cross Ranches*, ¶ 40 (the law of the case doctrine doesn't apply to findings of fact). Thus, the remand court wasn't prohibited from reconsidering the prior factual findings.

¶ 29    Next, Dakota argues that the remand court ignored the instructions in the mandate issued by this court following the supreme court's decision. That mandate said that "this case is returned to the [trial court] for further proceedings consistent with the opinion of the Colorado Supreme Court and that portion of the Court of Appeals opinion that was affirmed." According to Dakota,

15

the portion of the division majority's opinion that was affirmed included all rulings other than the impartiality standard. Not so. The portion that was affirmed related to the fee cap. And, again, the supreme court's explicit instructions on remand were to reconsider Haber's conduct under the correct standard.

¶ 30     Dakota also argues that the remand court lacked jurisdiction to consider the fee cap because the supreme court didn't remand the case for further consideration of that issue. But the supreme court's remand was broad, including a directive to evaluate all of Haber's conduct under the correct impartiality standard, and its ultimate holding as to the fee cap agreement was simply "declin[ing] to hold that [such agreements] render appraisers partial as a matter of law." *Owners Ins. II*, ¶ 48. Thus, the remand court arguably was correct in saying that, while the supreme court's ruling foreclosed it from finding that the mere existence of the fee cap rendered Haber partial, it still could consider whether the fee cap may have motivated Haber to advocate for Dakota.

¶ 31     But even if the supreme court's ruling is read more broadly to foreclose further consideration of the impact of the fee cap, the remand court didn't make any findings or conclusions specifically

16

related to the fee cap. The court referenced the fee cap in its final finding on Haber being swayed by personal interest, expressing that "[Haber]'s conduct under the fee [cap] agreement is subject to review in terms of the impartiality requirement."[2] But, ultimately, its finding focused on four specific items Haber erroneously included in her appraisal. While the fee cap may have suggested to the court that Haber could personally gain from an inflated appraisal, the underlying point was that Haber may have inflated the appraisal to favor Dakota. And this was only one of many findings the remand court made about Haber's partiality.

¶ 32　　Thus, even if the remand court was overinclusive in what it considered on remand, that had no impact on the outcome. *See Bernache v. Brown*, 2020 COA 106, ¶ 26 ("We will not disturb a judgment unless a court's error affected the substantial rights of the parties," meaning that it "'substantially influenced the outcome of the case or impaired the basic fairness of the trial itself.'" (quoting *Laura A. Newman, LLC v. Roberts*, 2016 CO 9, ¶ 24)).

---

[2] We disagree with Owners' argument that this reference in the remand court's decision was to Benglen's contingency agreement rather than Haber's fee cap agreement.

¶ 33    Finally, Dakota argues that the remand court erred by ordering another hearing when the supreme court didn't direct it to do so. Dakota acknowledges that the supreme court remanded the case to "determine whether Dakota's appraiser's conduct conformed to th[e] standard" it had articulated for appraiser impartiality. *Owners Ins. II*, ¶ 44; *see also id.* at ¶¶ 6, 50 (remanding "for further proceedings consistent with this opinion"). But Dakota argues that because the supreme court didn't order a new hearing, the remand court erred by conducting one and allowing Owners to introduce expert testimony, raise new arguments, revisit prior arguments, and introduce new evidence occurring after the first hearing.

¶ 34    To the contrary, when an appellate court issues a general remand for further proceedings, a trial court may accept new evidence and reconsider its prior rulings based on that evidence, so long as the trial court's actions are consistent with the mandate. *See, e.g., Thompson*, ¶¶ 21, 25; *Ferrel v. Colo. Dep't of Corr.*, 179 P.3d 178, 185 (Colo. App. 2007). And where, as here, an appellate court articulates new legal standards, it is appropriate for a trial court on remand to allow the parties "an opportunity to try the case

18

under the appropriate legal standards." *Pub. Serv. Co. v. Blue River Irrigation Co.*, 782 P.2d 792, 794 (Colo. 1989).

### B. Rulings on Motions

¶ 35 Dakota contends that the remand court abused its discretion by failing to rule on its pre-hearing motions to establish the scope of the remand, denying its requested stay, and ruling on evidentiary objections. *See Warembourg v. Excel Elec., Inc.*, 2020 COA 103, ¶ 88 (reviewing evidentiary rulings for an abuse of discretion); *Christel v. EB Eng'g, Inc.*, 116 P.3d 1267, 1270 (Colo. App. 2005) (reviewing decisions whether to stay proceedings for an abuse of discretion).

¶ 36 Contrary to Owners' arguments, we conclude that Dakota preserved its arguments from its pre-hearing motions by filing those motions and re-raising the issues in the motions at the start of the hearing, *see Banning v. Prester*, 2012 COA 215, ¶ 29, and that Dakota developed its appellate arguments sufficiently for us to review them, *see Woodbridge Condo. Ass'n*, ¶ 44.

¶ 37 However, we do agree that Dakota hasn't articulated any harm from the court's delay in addressing the scope of the remand. Given our rulings affirming the court's compliance with the law of

19

the case and mandate rule, it follows that the scope of the remand proceedings was appropriate. And Dakota hasn't explained how the delay affected its hearing preparations or otherwise caused it any prejudice. Thus, even if the court erred in deferring a ruling on the motions, any such error was harmless. *See Bernache,* ¶ 26.

¶ 38 The same is true of the remand court's denial of a stay for Dakota to file a C.A.R. 21 petition on the scope of the remand. Again, the scope of the remand proceedings was appropriate, and Dakota hasn't articulated any prejudice resulting from the denial of the stay.

¶ 39 Dakota similarly hasn't articulated any prejudice relating to its argument that the remand court employed erroneous and disparate standards to objections at the hearing. Dakota argues that the court instructed counsel at the start of the hearing that they couldn't lodge speaking objections but then at times allowed Owners' counsel to lodge longer objections while limiting Dakota's counsel to two-word objections. It also argues that, as a result of the court's rulings, it wasn't able to make a complete record of its objections and offers of proof. But the few times that counsel or the court requested an offer of proof, counsel was allowed to provide

one.  And Dakota hasn't articulated any additional objections, explanations, or offers of proof it would've provided or how they would've impacted the outcome of the case.  Accordingly, any alleged errors were harmless.  *See Bernache*, ¶ 26.

### C.    Application of the Legal Standard

¶ 40     Dakota contends that the remand court applied the wrong legal standard when it vacated the appraisal award.  We disagree.

¶ 41     We review de novo whether a trial court applied the correct legal standard in making factual findings.  *Briargate at Seventeenth Ave. Owners Ass'n v. Nelson*, 2021 COA 78M, ¶ 18.

¶ 42     We also review de novo issues of contract interpretation, including interpretation of insurance policy provisions.  *Morley v. United Servs. Auto. Ass'n*, 2019 COA 169, ¶ 15.  We construe an insurance policy according to the well-settled principles of contract interpretation, giving effect to the parties' intent and reasonable expectations.  *Id.*  We enforce an insurance policy as written unless the language is ambiguous, meaning that it is susceptible on its face of more than one reasonable interpretation.  *Id.* at ¶ 16.

¶ 43     Dakota relies on *Andres Trucking Co. v. United Fire & Casualty Co.* to support its argument that an umpire's award may be vacated

only if any misconduct is attributable to the umpire — not one of the appraisers.  2018 COA 144.  But *Andres* didn't consider and doesn't say anything about appraiser misconduct.  The issue in that case was an alleged error in the umpire's calculations.  *Id.* at ¶¶ 48-53.  Thus, in saying that a party had "failed to carry its burden to establish a 'manifest mistake' in the umpire's valuation," the division was merely applying the legal standards to the particular issue in that case.  *Id.* at ¶ 53 (citation omitted).

¶ 44     The *Andres* division's articulation of the legal standards, however, do apply more broadly to this case.  This includes the statements that "[t]he appraisal award issued under an insurance policy is binding so long as the appraisers (including the umpire) have performed the duties required of them by the policy" and that "an appraisal award entered by an umpire may be disregarded only if the award was made without authority or was made as a result of fraud, accident, or mistake."  *Id.* at ¶ 49.[3]

---

[3] *Andres Trucking Co. v. United Fire & Casualty Co.* also quotes a North Carolina case in stating that "[m]istakes by appraisers, like those made by arbitrators, are insufficient 'to invalidate an award fairly and honestly made.'"  2018 COA 144, ¶ 53 (quoting *Harleysville Mut. Ins. Co. v. Narron*, 574 S.E.2d 490, 496 (N.C. Ct.

¶ 45    Here, Haber's lack of impartiality signifies both that one of the appraisers didn't perform the duties required of her by the policy and that the award was made without authority. The policy unambiguously requires that, for an appraisal award to be binding on the parties, it must be "agreed" to by two of three persons — either the umpire and "a competent and impartial appraiser" or, conceivably, two "competent and impartial appraiser[s]." The award here was signed only by the umpire and Haber, who was not impartial. Thus, it's not binding.

¶ 46    In nearly identical circumstances, the Tenth Circuit similarly concluded that an appraisal award was invalid and, therefore, a trial court hadn't erred by vacating it. The Tenth Circuit interpreted identical policy language to signify that "an appraisal award is valid only if signed by two impartial appraisers," including the umpire in the generic reference to "appraisers." *Auto-Owners Ins. Co. v. Summit Park Townhome Ass'n,* 886 F.3d 852, 857 (10th Cir. 2018); *see also id.* at 855-56 (policy language). Thus, after affirming the

App. 2002)). As applied here, an award agreed to by a partial appraiser is not "fairly and honestly made" where the policy requires appraiser impartiality.

23

trial court's ruling that an appraiser who had signed the award was not impartial, the Tenth Circuit held that "[w]ith [the appraiser] disqualified, the appraisal award had only one valid signature (the umpire's)" and "[t]he award was therefore invalid under the terms of the insurance policy." *Id.* at 857.

¶ 47     Other cases also support this interpretation. *See, e.g., Copper Oaks Master Home Owners Ass'n v. Am. Fam. Mut. Ins. Co.*, No. 15-CV-01828-MSK-MJW, 2018 WL 3536324, at *9, *18 (D. Colo. July 23, 2018) (unpublished order) (summarizing federal cases as holding that, "[i]f the appraiser has a duty to be 'impartial' and is not, then he or she is disqualified without any showing of an effect of the lack of impartiality on the appraisal process or award" and vacating an award after determining one of the appraisers and the umpire were not impartial); *Colo. Hosp. Servs. Inc. v. Owners Ins. Co.*, No. 14-CV-001859-RBJ, 2015 WL 4245821, at *1, *3 (D. Colo. July 14, 2015) (unpublished order) (determining that an "appraisal award was not conducted in accordance with [an insurance] policy" with language functionally identical to that in this case because the

appraiser who agreed to the award wasn't impartial and, therefore, vacating the award).[4]

¶ 48    We agree with these cases and conclude that, where an insurance policy's appraisal provision requires the agreement of at least one impartial appraiser for an award to be binding, the lack of impartiality by the only appraiser to agree to the award invalidates it.  The remand court therefore did not err by vacating the award.[5]

### D.    Factual Findings

¶ 49    Dakota contends that the remand court's factual findings are unsupported by the record.  Relatedly, it also contends that the court improperly indicated its intent to rule in Owners' favor before the close of evidence.  We are not persuaded.

---

[4] Dakota suggests that the federal cases are inapplicable because they were brought under the CUAA and applied that statute's neutral arbitrator standards.  But on the relevant issue of what happens once an appraiser is found impartial, the cases relied not on the CUAA but on the language of the insurance policies — which was functionally identical to the language at issue here.

[5] Dakota also argues that the remand court erroneously relied on *Providence Washington Insurance Co. v. Gulinson*, 73 Colo. 282, 215 P. 154 (1923), in evaluating Haber's conduct.  But the court didn't rely on — or even cite — that case in its findings and conclusions.

¶ 50     We review a trial court's findings of fact for clear error and will not disturb them if there is any evidence in the record to support them. *Woodbridge Condo. Ass'n*, ¶ 24. It's the trial court's sole province to resolve factual issues, determine witness credibility, weigh evidence, and make reasonable inferences from that evidence. *In re Estate of Owens*, 2017 COA 53, ¶ 22. We may not reweigh evidence or substitute our own judgment for the trial court's. *Id.*

¶ 51     Although it's true, as Dakota points out, that we subject factual findings to heightened scrutiny "when a court adopts, virtually word for word, a party's proposed findings of fact," *Woodbridge Condo. Ass'n*, ¶ 24 n.8 (emphasis omitted), that's not what happened here. There are substantial differences between Owners' proposed findings and the findings the court adopted. And the court made clear that it had conducted its own independent analysis by stating at the beginning of its order that it had "considered the proposed orders, case file, and law"; making various changes to the proposed findings; and adding its own assessment of witness credibility (particularly as to Haber). *See Auto-Owners Ins. Co. v. Bolt Factory Lofts Owners Ass'n*, 2021 CO 32, ¶ 21 n.5.

¶ 52    We perceive no merit in Dakota's argument that the remand court improperly prejudged the case. Dakota relies solely on the judge's comment near the end of the hearing that she "had some significant regrets" about signing the previous judge's order right after she arrived in the division. That vague comment — which seemed to allude to regrets she may have had at the time or soon after she signed the order — in no way suggested that she had prejudged the issues on remand.

¶ 53    Turning to the factual findings on remand, Dakota argues that the findings on the following issues were not based on competent evidence: (1) whether the fee cap was operative; (2) whether Haber's pre-appointment visit to the property and meeting with Benglen and Dakota's board were improper; (3) whether Haber and Benglen were partners; (4) whether Haber's inclusion of damage occurring after the policy period was improper; and (5) whether Haber's refusal to answer certain questions at the hearing, her statement during the appraisal proceedings that she was confident in a positive outcome, her expert status, and her unrelated lawsuit against a different insurer evidenced partiality. We reject these challenges.

¶ 54     As to the first issue, the remand court didn't actually find that the fee cap was operative. As explained in Part II.A, the court alluded to the fee cap in its final finding on Haber being swayed by personal interest, but its finding ultimately was based not on the fee cap being operative but on specific items Haber improperly included in her appraisal.

¶ 55     As to Haber's pre-appointment visit to the property and meeting with Benglen and Dakota's board, the remand court noted these facts — which are supported by the record — in its factual summary. But the court didn't find that these particular activities were improper, nor did it cite or directly rely on these activities in its findings of partiality.

¶ 56     As to the association between Haber and Benglen, Dakota cites both individuals' hearing testimony denying any "partnership" and attempting to explain the reference to a "partner" in some of their emails. But there was ample evidence that, irrespective of the lack of any formal partnership, Haber and Benglen had a close working relationship with respect to the appraisal, and the remand court was entitled to rely on that evidence.

¶ 57    As to Haber's inclusion of damages post-dating the policy period, Dakota cites testimony suggesting that both appraisers had agreed to include in their estimates "all damage to the roofs," including damage from a later storm.  But there was also evidence that it was Benglen who elected to include the damage from the later storm in the claims and that Owners' appraiser didn't know the storm had occurred outside the policy period, when Dakota was no longer insured by Owners.

¶ 58    Finally, as to Haber's refusal to answer certain questions, her statement about being confident in a positive outcome on the claim, her expert status, and her lawsuit against another insurer, we discern no reversible error.  It was the remand court's province to determine witness credibility, the weight to accord the testimony, and the inferences to be drawn from it.  *See Owens*, ¶ 22.  And while the court was apparently confused about Haber's lawsuit — which was not against Owners but another insurance company — that error was harmless, particularly in light of the court's various other findings underlying its determination that Haber was partial. *See Marsico Cap. Mgmt., LLC v. Denver Bd. of Cnty. Comm'rs*, 2013 COA 90, ¶¶ 33-37.

### III.   Conclusion

The judgment is affirmed.

JUDGE FURMAN and JUDGE TOW concur.