24CA0080 Jim Black v Coleman 11-26-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA0080
Jefferson County District Court No. 22CV30319
Honorable Ryan P. Loewer, Judge

Jim Black Construction, Inc.,

Plaintiff-Appellee,

v.

Derek Coleman,

Defendant-Appellant.

JUDGMENT AFFIRMED IN PART AND VACATED IN PART

Division I
Opinion by JUDGE J. JONES
Grove and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 26, 2025

Wilson Elser Moskowitz Edelman & Dicker LLP, Ryan A. Williams, Gabrielle Lalonde, Denver, Colorado; Mark Champoux, Daniel A. Richards, Nicholas R. Peppler, Denver, Colorado, for Plaintiff-Appellee

Thomas P. Howard, LLC, Thomas P. Howard, Scott E. Brenner, Sam Thomas, Louisville, Colorado, for Defendant-Appellant

¶ 1 Defendant, Derek Coleman, appeals the trial court's judgment in favor of plaintiff, Jim Black Construction, Inc. (Jim Black), on its claims for foreclosure of a mechanic's lien, breach of contract, unjust enrichment, and promissory estoppel. We affirm the part of the judgment on the mechanic's lien foreclosure and breach of contract claims and vacate the part of the judgment on the unjust enrichment and promissory estoppel claims.

## I. Background

¶ 2 Late one night, a fire broke out in Coleman's home, causing significant damage. While firefighters were putting out the fire, representatives from Jim Black met with Coleman in his front yard. That night, Coleman and Jim Black agreed that Jim Black would stabilize Coleman's house to mitigate further damage. Two days later, Coleman went to Jim Black's office and engaged the company to restore Coleman's house to its pre-fire condition. During this meeting, Coleman signed two contracts: (1) a restoration "Proposal" (Proposal), which provided that Jim Black would supply labor and materials for the project; and (2) a "Work Authorization and Direction to Pay" (Work Authorization), which, among other things, allowed Jim Black to begin the restoration process as authorized by

either Coleman or his insurance company.  With the agreements signed, Jim Black started restoring the property.

¶ 3    Shortly thereafter, Cogdill Consulting (Cogdill), a third party working with Coleman's insurance company, created an estimate for the project.  Jim Black agreed to Cogdill's estimate and referred to it throughout the restoration process.

¶ 4    Several months into the project, Coleman asked Jim Black to change parts of the house's pre-fire architectural design, and Jim Black subsequently added those changes to its restoration plan.  To comply with Coleman's request, Jim Black had to obtain new bids from subcontractors and new estimates for the cost of repair, all of which slowed down the restoration project.  As a result of the slowdown, Coleman became dissatisfied and terminated Jim Black about twenty months into the project.

¶ 5    After being terminated, Jim Black sent Coleman its final invoice for the project, totaling $166,857.44.  The invoiced amount was based on Cogdill's estimate, a change order sent to Coleman by Jim Black, and various invoices from Jim Black's subcontractors.  When Coleman received the invoice, he emailed Jim Black asserting that there were "a lot of things that [Jim Black] charged more than

once." Jim Black representatives offered to meet with Coleman to discuss the alleged duplicate charges, but Coleman didn't respond to the requests. After it didn't hear from Coleman or receive payment, Jim Black filed a mechanic's lien against Coleman's property for the final invoice amount. Jim Black then filed suit against Coleman, asserting claims for foreclosure of the lien, breach of contract, unjust enrichment, and promissory estoppel. Coleman asserted counterclaims for breach of contract, promissory estoppel, fraud, negligent misrepresentation, and recording of an excessive lien.

¶ 6    During discovery, Jim Black found a duplicate charge of $2,160 in its initial billing, which related to engineering fees (an accounting error) and reduced the claimed lien by that amount, plus 10% profit and 10% overhead fees (for a total of $2,592), resulting in a new total of $164,265.44.

¶ 7    Following a bench trial, the court found in Jim Black's favor on all of its claims and all of Coleman's counterclaims. The court ordered Coleman to pay Jim Black $164,265.44 (the revised amount), plus interest, costs of enforcement, and attorney fees.

Coleman only appeals the portion of the judgment on Jim Black's claims.

## II. Discussion

¶ 8 Coleman contends the trial court erred by (1) finding that he failed to prove that Jim Black's mechanic's lien was excessive; (2) finding that the lien, as recorded, included only $2,592 in excess charges; (3) failing to enforce the provision in the Proposal addressing changes to the scope of the work; and (4) entering judgment in Jim Black's favor on its unjust enrichment and promissory estoppel claims. We reject Coleman's first three contentions but agree with the fourth.

### A. Application of the Mechanic's Lien Statute

¶ 9 Coleman initially contends that the trial court applied an incorrect legal standard in determining whether Jim Black's mechanic's lien was excessive and clearly erred by finding that Jim Black didn't know that its lien was excessive when recorded. We disagree with both contentions.

### 1. Correct Legal Standard

#### a. Standard of Review and Applicable Law

¶ 10　We review the trial court's interpretation of the mechanic's lien statutes de novo. *Galiant Homes, LLC v. Herlik*, 2025 COA 3, ¶ 22; *Sure-Shock Elec., Inc. v. Diamond Lofts Venture, LLC*, 2014 COA 111, ¶ 8.

¶ 11　Section 38-22-128, C.R.S. 2025, governs forfeiture of a mechanic's lien when a claimant files a lien for an amount greater than what's due. "The intent of section 38-22-128 is to punish and deter those who abuse the mechanic's lien statute by knowingly and intentionally claiming excess amounts . . . ." *Honnen Equip. Co. v. Never Summer Backhoe Serv., Inc.*, 261 P.3d 507, 510 (Colo. App. 2011). Thus, a party asserting that a mechanic's lien is excessive within the meaning of the statute must show that (1) the lien amount exceeds what was due when the lien was recorded; (2) there was no reasonable possibility that the amount of the lien was then due; and (3) the lien claimant knew that the amount claimed was greater than the amount due. § 38-22-128; *see Honnen Equip. Co.*, 261 P.3d at 510 (citing *LSV, Inc. v. Pinnacle Creek, LLC*, 996 P.2d 188, 192 (Colo. App. 1999)).

### b. Analysis

¶ 12    Coleman argues that while "the court began by applying the correct legal standard," it ultimately applied an erroneous standard by finding that Jim Black didn't have any reason to believe that there was an accounting error in the final invoice (concerning the duplicate charge of $2,592 for engineering fees). But the court made that finding expressly in the context of determining whether Jim Black knew that the amount claimed was greater than the amount actually owed — one of three elements of an excessive lien claim. The accounting error was the basis of Coleman's allegation that Jim Black knew that its lien was excessive. And so the court was merely addressing that allegation under the applicable element of the claim. *See* § 38-22-128; *see also Galiant Homes,* ¶¶ 23, 35 (the trial court used the terms "reasonable belief" and "knowledge" interchangeably).

¶ 13    Coleman also argues that the trial court added a new element to the test by saying that the accounting error in Jim Black's final invoice wasn't so "egregious to render the lien amount facially excessive." But, again, the court made this finding in the context of

determining whether Jim Black knew that its lien was excessive when recorded.

  2.  Whether Jim Black Knew its Lien was Excessive

      a.  Applicable Law and Standard of Review

¶ 14   As noted, to void a lien under section 38-22-128, a party must prove, among other things, that the lien claimant knew that the lien was excessive when recorded.  In this context, knowledge is "an awareness . . . of a fact or circumstance." *JW Constr. Co. v. Elliott*, 253 P.3d 1265, 1271 (Colo. App. 2011) (quoting Black's Law Dictionary 950 (9th ed. 2009)).

¶ 15   In determining whether the lien claimant knew that the lien was excessive when recorded, the fact finder must consider "the information available to the lien claimant at the time of filing the lien statement." *E.B. Roberts Constr. Co. v. Concrete Contractors, Inc.*, 704 P.2d 859, 864 (Colo. 1985).  And the fact finder should keep in mind that, while it may turn out that there was no possibility that the amount claimed was due, the claimant could have been unaware that there wasn't a reasonable possibility that the amount claimed was due.  *See Galiant Homes*, ¶ 34.

¶ 16 Because the determination whether a lien was excessive is a question of fact, we review a trial court's finding for clear error. *Byerly v. Bank of Colo.*, 2013 COA 35, ¶ 32. "A finding is clearly erroneous if there is no evidence in the record to support it." *Id.*; *see E.B. Roberts*, 704 P.2d at 864.

b. Analysis

¶ 17 Coleman contends that his email saying there were "a lot of things that you . . . charged more than once" and Jim Black's acknowledgment of a duplicate charge of $2,592 after filing the lien show that Jim Black didn't "lack[] the information necessary to identify the duplicate charge." But the test isn't whether a claimant had enough information; it's whether it *knew* the lien was excessive at the time of filing. § 38-22-128.

¶ 18 There is evidence in the record showing that Jim Black didn't know the lien was excessive when filed. Coleman's email, referring to an invoice with hundreds of line items, only mentioned a possible duplicate asbestos abatement charge, but nothing else that had been "charged more than once." And after Coleman emailed Jim Black, Jim Black reached out multiple times to Coleman offering to review the invoice with him. Jim Black's offers to meet with

8

Coleman are evidence that it was *unaware* of what specific duplicate items Coleman was concerned about. And it was Jim Black that identified the duplicate engineering fee in the final invoice during discovery and made clear that it wasn't seeking to recover that amount. This adjustment is evidence that Jim Black believed that the accounting error was the extent of the duplicate charges. Further, Jim Black employees testified about the process of creating the final invoice — which included reviewing the invoices and estimates and having the project manager review the final invoice after Coleman voiced concerns. From all this, the fact finder reasonably could conclude that Jim Black didn't knowingly record an excessive lien.

¶ 19    In arguing for a contrary conclusion, Coleman references two cases in which divisions of this court found a mechanic's lien to be excessive: *Wigham Excavating Co. v. Colorado Federal Savings & Loan Ass'n,* 796 P.2d 23, 24 (Colo. App. 1990); and *LSV,* 996 P.2d at 191. But in those cases, the divisions concluded that the record evidence showed that the lien claimants *knew* their liens were for more than what was due when they filed them. *Wigham,* 796 P.2d

at 24-25; *LSV*, 996 P.2d at 191.  In this case, however, record evidence supports the trial court's contrary finding.

### B.    Uncollectable Charges

¶ 20    Coleman next contends that the trial court clearly erred by finding that the lien included only $2,592 in excess charges.  We disagree.[1]

### 1.    Standard of Review

¶ 21    We review the trial court's findings concerning excess charges for clear error.  *See Byerly*, ¶ 32.

### 2.    Duplicate Asbestos Charges

¶ 22    Coleman argues that Jim Black knowingly charged him for work in the final invoice that he had already been billed for in a separate asbestos abatement invoice, which he had paid.  For example, in the final invoice, Jim Black charged Coleman for removing the dishwasher, garbage disposal, and range from the

---

[1] As an initial matter, Jim Black contends that Coleman didn't preserve this argument for appeal.  But Coleman's counsel raised the excess charges issue, in some detail, in his written closing argument, and "arguments may be preserved for appeal by raising them during closing argument." *Bachelor Gulch Operating Co. v. Bd. of Cnty. Comm'rs*, 2013 COA 46, ¶ 11 (citing *Target Corp. v. Prestige Maint. USA, Ltd.*, 2013 COA 12, ¶ 23).  Thus, the issue is preserved.

house. But Coleman argues that these items had already been removed by the abatement company. He relies on photos taken by a forensic engineering firm after the abatement. Because those items aren't shown in the photos, he says the abatement company must have removed them. But those photographs don't show that the cost of removing the items was charged in the abatement invoice, which doesn't specifically identify any of these items. And Jim Black's senior project manager, James Crump, testified at trial that the photographs don't indicate who removed an item from the house.

¶ 23    Considering the ambiguity in the record, and our standard of review, Coleman asks too much of us. *See Carousel Farms Metro. Dist. v. Woodcrest Homes, Inc.*, 2019 CO 51, ¶ 18 (appellate courts aren't "forced to take a fine-toothed comb to . . . each case"). As noted, we review factual findings for clear error. The trial court resolves issues of fact, and we won't "reweigh evidence or substitute our own judgment for the trial court's." *Owners Ins. Co. v. Dakota Station II Condo. Ass'n*, 2021 COA 114, ¶ 50.

¶ 24    In addition to the alleged duplicate charges, Coleman argues that Jim Black's accountant, Heather Lovelace-Meyers, falsely

11

claimed in an email that there was "additional asbestos found and abatement happened a second time." He contends the lien included charges for this second abatement that never occurred, and therefore the lien was excessive. But Lovelace-Meyers testified at trial that she had misunderstood the asbestos-related charge in the final invoice. Based on that misunderstanding, she mistakenly told Coleman there was a second asbestos abatement. And, in a subsequent email, Lovelace-Meyers told Coleman that the asbestos-related charge in the final invoice was instead "for the micro vac and full report details," which cost $2,818.

¶ 25 We note that in the final invoice, there are two asbestos-related charges, totaling $2,818. The subcontractor charged Jim Black directly for this work. Thus, the record supports the finding that these charges are for the micro vac and full report details, and that Jim Black correctly charged for them in its final invoice to Coleman. We therefore don't see any clear error with respect to the asbestos-related charges.

### 3.    Charges for Work Not Performed

¶ 26    Coleman also argues that Jim Black invoiced him for over $40,000 for work that it never performed.  The record doesn't support this argument.

¶ 27    Coleman identifies six services or items for which Jim Black charged him that he asserts were never performed: temporary toilet services, plumbing, concrete work, dumpster services, carpentry, and additional permits and fees.  His assertion is based on comparing the final invoice to invoices from subcontractors and suppliers that Jim Black submitted as supporting evidence.

¶ 28    But the evidence provided at trial supports the trial court's finding that the final invoice is correct.  For example, though Coleman asserts that Jim Black's invoice charged an additional $529.29 for temporary toilet services based on various invoices that Jim Black received for *six* months of toilet services, totaling $827.59, the final invoice was for *eight* months of such services.  The fact that Jim Black introduced into evidence only six months' worth of supporting invoices doesn't mean it wasn't on the hook to the supplier for eight months' worth of services.  And the total amount Jim Black charged Coleman in the final invoice equals the

amount estimated in the Cogdill estimate, prorated up until Coleman terminated the agreement. The Work Authorization form that Coleman signed explicitly authorized his insurance company to approve the Cogdill estimate, and the insurance company did so.

¶ 29    Similar evidence introduced at trial supports a conclusion that Jim Black validly charged for the five other services or items as well. For example, the Cogdill report estimated that five hours of plumbing winterization would cost $595.15, and that is the amount Jim Black charged in its final invoice. The Cogdill estimate also reflects *ten* dumpster loads for $536.64 per load, while the final invoice reflects *eight* loads for the same price. As for the concrete work, a change order provided to Coleman by Jim Black reflects the $12,000 price charged in the final invoice.

¶ 30    The record also supports Jim Black's charge for carpentry work. Coleman argues that Jim Black charged him for 106 hours of carpentry work, but the record supports a finding of only 53 hours of work by Jim Black employees. But carpentry work done by other companies was billed to Jim Black during the restoration process. And the price in the final invoice reflects the amount

charged by Jim Black employees and the subcontractor.[2] Thus, the record supports Jim Black's invoice amount for carpentry.

¶ 31 Lastly, the record also supports Jim Black's charge for permits and fees. Coleman argues that Jim Black overcharged him for $31,000 in permits and fees that aren't supported by the record. He asserts that the only evidence in the record relates to the permit from the City of Wheatridge, which cost $11,403.87. But the permits and fees section of the final invoice also includes invoices for engineering bids and architectural fees. And these invoices added together equal the amount reflected in the final invoice.

¶ 32 Jim Black also supported its final invoice amount through Crump's testimony. He testified that he created the final invoice by relying on the Cogdill estimate, subcontractor invoices, and the change order. He also testified that he personally approved the

---

[2] The final invoice charges 160 hours of carpentry at $69.39 per hour. The invoice for Jim Black's employee work records fifty-three hours of carpentry work. And the carpentry subcontractor charged Jim Black $7,605. If we divide the total price from the subcontractor by the price per hour ($7,605 \div 69.39$), we get 110 hours. The subcontractor therefore charged for 110 hours of work. Adding the subcontractor's 110 hours to Jim Black's 53 hours roughly equals the 160 hours Jim Black charged Coleman in the final invoice.

payments to subcontractors. And, contrary to Coleman's argument, Crump's testimony didn't directly contradict the evidence presented at trial.

¶ 33 The trial court found Crump's testimony to be more credible than Coleman's due to Coleman's "inconsistency of testimony and overall demeanor on the witness stand."

¶ 34 To at least some extent, Coleman, in effect, asks us to find Crump's testimony incredible. That we cannot do. *In re Estate of Owens*, 2017 COA 53, ¶ 22 ("[A] trial court's 'determination of' a testifying witness' 'credibility [is] entirely within the purview of the trial court . . . and is binding upon' an appellate court." (quoting *People v. Fordyce*, 705 P.2d 8, 9 (Colo. App. 1985))); *Morgan v. Freel*, 538 P.2d 890, 891 (Colo. App. 1975) (not published pursuant to (C.A.R. 35(f)) ("The credibility of witnesses . . . [is] within the province of the trial court, and . . . [findings supported by the record] may not be disturbed on review by this court.").

## C. Contractual Analysis

¶ 35 Coleman contends that the trial court applied an incorrect analysis in finding him liable on Jim Black's breach of contract claim. More specifically, he argues that the court misinterpreted

the parties' agreements by failing to enforce a change orders provision in the Proposal. We disagree.

### 1. Standard of Review and Applicable Law

¶ 36   We review an issue of contract interpretation de novo. *Fed. Deposit Ins. Corp. v. Fisher*, 2013 CO 5, ¶ 9.

¶ 37   We of course endeavor to determine and give effect to the contracting parties' intent. *Ad Two, Inc. v. City & County of Denver*, 9 P.3d 373, 376 (Colo. 2000). And we do so primarily by looking to the contract's language. *Id.*

¶ 38   "If a simultaneously executed agreement between the same parties, relating to the same subject matter, is contained in more than one instrument, the documents must be construed together to determine the intent as though the entire agreement were contained in a single document." *O'Reilly v. Physicians Mut. Ins. Co.*, 992 P.2d 644, 648 (Colo. App. 1999); *see also E. Ridge of Fort Collins, LLC v. Larimer & Weld Irrigation Co.*, 109 P.3d 969, 975 (Colo. 2005) ("[S]eparate instruments that pertain to the same transaction should be read together even though they do not expressly refer to each other . . . .").

¶ 39    A contract may be modified via a subsequent written or verbal agreement. *James H. Moore & Assocs. Realty, Inc. v. Arrowhead at Vail*, 892 P.2d 367, 372 (Colo. App. 1994). This is true even if the original agreement says that any modifications are to be made in writing. *Id.* A contract provision may also be impliedly waived if a party "acts inconsistently with [the contractual provision's] assertion." *Id.*

## 2.    Analysis

¶ 40    The Proposal says that "[a]dditional work, not covered by the Scope of Work, may be accomplished (a) by Change Order (as described below) or (b) by verbal agreement, if such verbal agreement is followed by a Change Order within ten (10) days of the verbal agreement." It goes on to define "Change Order," in part, as "a written order," agreed to by both Jim Black and Coleman. Relying on these provisions, Coleman argued in the trial court that Jim Black wasn't entitled to recover for work beyond the original scope of work that wasn't approved by a written change order. The trial court, however, rejected that argument, relying on a provision in the Work Authorization's "Terms and Conditions" saying that "supplements or additions to work may be accomplished verbally *or*

18

with a written change order." (Emphasis added.) It also says that the scope of work "shall be as referenced on the Work Authorization." And it says that the "Work Authorization . . . and [Jim Black's] performance of Work are governed solely by Contractor's Terms and Conditions."

¶ 41 Coleman argues that the trial court incorrectly construed the Proposal and the Work Authorization together, and that the terms of the Proposal, not the Work Authorization, should control as to additional work. We aren't persuaded.

¶ 42 The parties entered into the Proposal and Work Authorization at the same time, and both related to the restoration of Coleman's house. Thus, it was proper to construe them together. *E. Ridge of Fort Collins*, 109 P.3d at 975.

¶ 43 Coleman doesn't contest the trial court's factual finding that the parties verbally agreed to additional work that Coleman requested. And there is no evidence that Coleman ever objected to Jim Black doing that work based on the lack of a written change order. These facts support the trial court's approach, for three reasons.

19

¶ 44    First, the parties' course of conduct shows that they regarded

the Work Authorization's provisions in this regard as controlling.

*See In re Water Rts. of Town of Estes Park*, 677 P.2d 320, 327 (Colo.

1984) ("It is also well-established that the parties' construction of a

contract before a dispute arises is a particularly persuasive aid in

determining the true meaning of the agreement.").  Second, even

assuming that the Proposal's modification provision conflicts with

the Work Authorization's modification provision, the parties were

still free to modify the contract by verbal agreement.  *See James H.*

*Moore & Assocs. Realty*, 892 P.2d at 372.  And third, even if the

Proposal's provision controlled, the evidence shows that Coleman

waived it by his conduct.  *See id.*; *see also Rush Creek Sols., Inc. v.*

*Ute Mountain Ute Tribe*, 107 P.3d 402, 406 (Colo. App. 2004) ("[W]e

may affirm the trial court's ruling based on any grounds that are

supported by the record.").

D.    Unjust Enrichment

¶ 45    Lastly, Coleman contends that the trial court incorrectly

entered judgment in Jim Black's favor on its unjust enrichment and

promissory estoppel claims because the court entered judgment in

Jim Black's favor on its breach of contract claim based on a

contract covering the same subject matter as the unjust enrichment and promissory estoppel claims. We agree.[3]

### 1. Standard of Review and Applicable Law

¶ 46    Coleman's argument presents an issue of law. We review such issues de novo. *See Interbank Invs., LLC v. Eagle River Water & Sanitation Dist.*, 77 P.3d 814, 816 (Colo. App. 2003).

¶ 47    Subject to exceptions not applicable in this case, "breach of contract and unjust enrichment claims involving the same subject matter are mutually exclusive." *Bd. of Governors of Colo. State Univ. v. Alderman*, 2025 CO 9, ¶ 36. The same rule applies to promissory estoppel claims (if an enforceable contract is found). *Air Sols., Inc. v. Spivey*, 2023 COA 14, ¶¶ 99-101.

---

[3] Jim Black contends that Coleman can't make this argument on appeal because he pleaded counterclaims for breach of contract, unjust enrichment, and promissory estoppel, thus inviting any error. The invited error doctrine "prevents a party from complaining on appeal of an error that he or she has invited or injected into the case." *People v. Rediger*, 2018 CO 32, ¶ 34. Coleman pleaded his counterclaims in the alternative: he didn't seek recovery on all claims. Nor did he ever concede in the trial court that Jim Black could recover on all its claims. Thus, any error wasn't invited.

## 2. Analysis

¶ 48 Because the trial court found a valid contract between the parties and awarded damages to Jim Black on that contract, it could not enter judgment in Jim Black's favor on its unjust enrichment or promissory estoppel claims. These claims covered the same subject matter as Jim Black's breach of contract claim. Indeed, Jim Black expressly pleaded those claims only "in the alternative to" its breach of contract claim or in addition to that claim if the court found that Coleman agreed to work outside the scope of the contract. The court didn't find that Coleman agreed to work outside the scope of the contract, nor did it award Jim Black any additional or different damages on those claims. It follows that the part of the judgment in Jim Black's favor on its unjust enrichment and promissory estoppel claims cannot stand. *Bd. of Governors*, ¶¶ 36, 44; *Air Sols.*, ¶¶ 99-101.

## III. Disposition

¶ 49 We vacate that part of the judgment in Jim Black's favor on its unjust enrichment and promissory estoppel claims. In all other respects, the judgment is affirmed.

JUDGE GROVE and JUDGE SCHUTZ concur.

22